Argued and submitted October 8, 1984, reversed August 20, 1985

In the Matter of the Marriage of

HAXTON,
*Respondent,*
*and*

HAXTON,
*Appellant.*

(78-0873)

HAXTON,
*Petitioner on Review,*

*v.*

HAXTON,
*Respondent on Review.*

(15-82-08058)
(CA A27976; SC S30789)

705 P2d 721

Gary D. Jensen, Eugene, argued the cause and filed the petition and briefs for petitioner on review.

James A. Hendershott, Eugene, argued the cause for respondent on review. With him on the brief was Hendershott & Hendershott, Eugene.

ROBERTS, J.

## ROBERTS, J.

The issue is whether ORS 109.010 provides a cause of action for support against his parent for an adult who is mentally handicapped to the extent that his handicap prevents him from securing employment. That statute provides:

> "Parents are bound to maintain their children who are poor and unable to work to maintain themselves; and children are bound to maintain their parents in like circumstances."

The parents were married on December 20, 1958, and were divorce in August 1978. The decree of dissolution awarded custody of the couple's four children to mother and provided for support payments by father for all four children. Two children are over the age of 18 and father's support obligations for these two children have terminated. The parents have a minor son, for whom father is currently providing support. Another child, James, a party to this litigation, is mentally retarded. At the time of trial, James was 20 years old, residing with his mother, unemployed and not attending school. The trial court found from expert testimony that James' disability prevented him from securing employment.

Mother first filed an action to modify the decree of dissolution to increase the support payments for the minor son and to require father to provide support for James. Two months later, mother filed a separate action for James' support in her own name, and later amended the complaint to an action in James' own name with mother as guardian ad litem. Both actions were consolidated for trial. In one judgment, the trial court increased the support obligation for the minor son in the modification action, and awarded monthly support payments of $225 to James in the separate action for support. Father appealed that provision of the judgment awarding support to James. The Court of Appeals reversed, finding that ORS 109.010 states only a legal duty to support and provides no mechanism by which to enforce the obligation. 68 Or App 218, 680 P2d 1008 (1984). James petitioned for review.

Mother does not seek a modification of the child support provision. Both parties agree that the trial court's authority, if any, for the award must be found in ORS 109.010.

Father argues that "children," as used in this statute, means minor children, that is, those under the age of 18. He

asserts that, although the statute may be a codification of the common law duty imposed on parents to support their children, the duty extended only to minor children. It is father's position that other procedures exist for enforcement of the general duty of support found in ORS 109.010 and these are exclusive. Father points to provisions of the domestic relations statutes, ORS chapters 107 through 110, and provisions found in our public welfare statutes, specifically ORS chapter 416. None of these enforcement procedures apply to an adult child who is not eligible for public assistance from the state.

Mother contends that the word children connotes a relationship, not a temporary status by virtue of age. She points out that, by statute, the obligation of support is reciprocal. Children are both beneficiaries of the parents' duty and providers of support to their parents. Mother reasons from this that the term children logically cannot be limited to unemancipated minors. Mother asserts that the enforcement procedures available by statute are not exclusive. She urges that ORS 109.010 states a duty capable of enforcement in its own right.

## I. ORIGINS OF FAMILIAL OBLIGATIONS OF SUPPORT

The rights and responsibilities of family members toward each other are regulated by many of our statutes. Parental support obligations toward minor children after dissolution are addressed in ORS 107.095, 107.105, 107.108 and 107.135. The criminal code prohibits child abandonment and neglect by those adults, most often the parents, with a responsibility to maintain the child. ORS 163.535, 163.545. Our laws punish a parent's failure to support a child financially. ORS 163.555.[1] *See also Burnette v. Wahl,* 284 Or 705, 709, 588 P2d 1105 (1978). Linde, J., in his dissent in *Burnette* noted that many of our criminal laws are redefinitions of common law crimes and have civil analogues in common law torts. Alternatively, criminal and regulatory laws may be enacted "to add governmental enforcement to the recognized obligations of a relationship existing apart from the legislation." 284 Or at 728.

---

[1] The crime of nonsupport of indigent parents, former ORS 167.635, enacted by Oregon Laws 1921, chapter 159, section 1, was repealed in 1971. Or Laws 1971, ch 743, § 432.

Of particular relevance to the present case is the development of two civil statutes, ORS 416.061 and ORS 109.010, both of which address the duty of close family members, defined differently in the two statutory schemes, to support indigent relatives. Both statutes set forth a similar duty to support. However, their historical antecedents, purposes and development indicate that these statutes were enacted to address separate social concerns. ORS chapter 416, the relative responsibility law, has its origins in the Elizabethan poor laws of 1601. These laws constituted one of the first systems of public welfare for the poor.[2] ORS 109.010 represents private familial obligations that developed in America independently of England.

### A. Statutory Duty of Support

The Elizabethan poor laws, including the provision requiring family members to support their needy relatives, provided a model for the systems of public support found in most American jurisdictions, including our own and those of New York. tenBroek, *California's Dual System of Family Law: Its Origin, Development and Present Status, Part I,* 16 Stan L Rev 257, 258 (1964). The Elizabethan poor laws came into being in response to the demise of the power and wealth of religious institutions, which had assumed the burden to support the poor, and the subsequent unrest manifested in widespread vagrancy and begging that unassuaged poverty engendered. Professor tenBroek writes that the poor laws culminated the process of shifting the burden to alleviate poverty "from the ecclesiastical, private and voluntary to the civil, public and compulsory." tenBroek, *supra* at 282.

In the Elizabethan system, support of the poor was achieved by taxation and was regulated at the county level. As a corollary, these statutes included features intended to reduce the burden on the public treasury. For example, the poor laws mandated forced labor at fixed wages for all paupers capable of working. They relocated the poor to the parishes of their birth and limited their mobility. They provided criminal sanctions for vagrancy, begging and refusing to work if able.

---

[2] One source indicates that as early as the twelfth century Iceland had a law requiring local councils (samkomur) to take responsibility for the care of impoverished persons who had no relatives able to assume this obligation. *Freedom and Welfare* 446 (Nelson ed. 1953).

Finally, they compelled financially able relatives to contribute to the support of family members who were public charges.[3] This last law, 43 Eliz 1, c. 2 § 7 (1601), provided:

> "And be it further enacted, That the father and grandfather, and the mother and grandmother, and the children of every poor, old, blind, lame and impotent person, or other poor person not able to work, being of a sufficient ability, shall, at their own charges, relieve and maintain every such poor person in that manner, and according to that rate, as by the justices of peace of that county where such sufficient persons dwell, or the greater number of them, at their general quarter-sessions shall be assessed; (2) upon pain that every one of them shall forfeit twenty shillings for every month which they shall fail therein."

This law found its way into the American statutes regulating public support of the poor, discussed *infra.*

## B. Common Law Duty of Support

While it is doubtful that English common law recognized enforceable familial obligations of support apart from the Elizabethan poor laws,[4] such was not the case in the United States. Early American cases recognized the parents', specifically the father's, duty to support his children.[5] The duty of support, which was examined in a variety of contexts, was often said to exist as a matter of common law and independently of statute. *See Hillsborough v. Deering,* 4 NH

---

[3] A more complete description of the poor laws system is provided in tenBroek, *California's Dual System of Family Law: Its Origin, Development and Present Status, Part I,* 16 Stan L Rev 257, 258-287 (1964). *See also* Mandelker, *Family Responsibility Under the American Poor Laws: I & II,* 54 Mich L Rev 497 and 54 Mich L Rev 607 (1956).

[4] Early commentators speak of the parents' natural duty to support their children. 1 Blackstone, *Commentaries on the Laws of England* * 447 (Cooley ed 1899). However, there is little indication that the English common law conferred a legally enforceable duty between parents and children, or other relatives, to support and maintain each other. *See* Field, *The Legal Relations of Infants, Parent and Child, and Guardian and Ward* 57 (1888); Browne, *Elements of the Law of Domestic Relations* 72 (1883).

[5] One court explains the dearth of cases on this topic this way:

"Nature has implanted in all men a love for their offspring that is seldom so weak as to require the promptings of law, to compel them to discharge the duty of shielding and protecting them from injury, suffering and want, to the extent of their ability. Hence the courts are seldom called upon to enforce the duty of parents. The law of nature, the usages of society, as well as the laws of all civilized countries, impose the duty upon the parent of the support, nurture and education of children." *Plaster v. Plaster,* 47 Ill 290, 291 (1868).

86, 95 (1827) (child's right to support from parent derives from common law and exists independently of statute); *Godfrey v. Hays,* 6 Ala 501, 502 (1844) (father obliged to support son and in exchange entitled to earnings of son); *McGoon v. Irvin,* 1 Pin 526, 532 (Wis 1845) (parents have legal obligation to maintain and support children; must reimburse third person for necessaries provided to child); *Thompson and Waters v. Dorsey,* 4 Md Ch 149, 151 (1853) (father's estate must reimburse third person who supplied necessaries to child because parents are bound to maintain their children); *House v. House,* 6 Ind 60, 61 (1854) (another family member entitled to reimbursement from father's estate for support of adult incompetent son; court found both a "contract" by father and a "moral obligation" to support son); *Haase v. Roehrscheid,* 6 Ind 66, 68 (1854) (father, trustee of children's estate, had duty to support and educate his children and therefore could not make a claim for reimbursement against their estate without showing of inability to meet his duty); *Dawson v. Dawson,* 12 Iowa 512, 514-15 (1861) (the obligation of parents to support their children is a perfect common law duty but third person not entitled to reimbursement from adult child for necessaries furnished to father. Child's obligation to parent is a duty imposed only by statute); *Plaster v. Plaster,* 47 Ill 290, 291 (1868) (mother brought a suit at equity for child support from the father; father had a natural and legal duty to support his child which duty was enforceable in equity); *Tanner v. Skinner,* 74 Ky (11 Bush) 120, 130 (1874) (father not entitled to reimbursement from children's estate for costs of their support because this is a legal duty father owes children); *In re Hippert's Estate,* 12 Lanc Bar 68 (Pa 1880) (children not entitled to support claim from mother's estate. At common law only father was bound to support his children); *Johnson v. Barnes,* 69 Iowa 641, 643 (1886) (wife not entitled to contribution from husband when both parents were equally responsible to support children because "independent of any statute, parents are bound to contribute to the support of their minor children * * *."); *Gilley v. Gilley,* 79 Me 292, 295 (1887) (mother successfully sued father for support of children. By the common law, without reference to any statute, a father of sufficient ability is as much bound to support his children as a husband is bound by the common law to support his wife); *Porter v. Powell,* 79 Iowa 151, 153 (1890) (father obliged to

third person who provided necessaries to child. Parental obligations to support children exist independent of statute).

*Johnson v. Barnes, supra,* made explicit reference to the difference between the English common law, which did not recognize a parental duty of support, and the American common law, which recognized such a duty. The court noted the uncertainty or nonexistence of the English common law duty but was "not prepared to say that this rule has been adopted in this country * * *." 69 Iowa at 643. *Gilley v. Gilley, supra,* acknowledged the minority American position, similar to England's, that no duty of support existed outside of statute but applied the "settled" state law that such a duty existed and was enforceable. 79 Me at 296.

All cases involved minor children. However, *Plaster v. Plaster, supra,* elaborated in dictum that the duty of support should also extend into the child's adulthood "if from physical debility and impaired health, the boy is unable to earn a livelihood, and must depend upon others for support * * *." 47 Ill at 294. *Porter v. Powell, supra,* reasoned that the parental obligation of support is not grounded in the duty of the child to serve the parent but on the inability of the child to care for itself. Therefore, the parent has a "legal as well as * * * moral duty" to support his child "when [she is] unable, from infancy, disease or accident, to earn her own necessary support * * *." 79 Iowa at 159.

The development in New York of the parents' common law obligation of support is of particular interest because of its influence on the New York Field Codes, a comprehensive codification of laws and the likely model for both of our statutory duties of support.[6] In *Van Valkinburgh v. Watson,* 13 Johns 480 (NY Sup Ct 1816), the court recognized the parent's "natural obligation" to supply necessaries for his minor children and indicated that if a third person supplies necessaries required by the parent's neglect, the third person has conferred a benefit upon the parent and the law will imply a promise to pay. The court did not allow recovery in the case because it found that the child was cared for adequately and the father had not neglected his duty of support.

---

[6] Statutes of Oregon 1854, preface, enacted by the Oregon Territorial Legislature; Beardsley, *Code Making in Early Oregon,* 27 Pac NW Q 3, 24 (1936); Kelly, *History of the Preparation of the First Code of Oregon,* 4 Or Hist Q 185, 190 (1903).

*Edwards v. Davis,* 16 Johns 281 (NY Sup Ct 1819), a suit between siblings seeking contribution for expenses incurred in supporting parents, distinguished between the child's duty to support its parents, a duty the court found derived from statute and not common law, and the parents' duty to support their children: "The duty of a parent to maintain his offspring, until they attain the age of maturity, is a perfect common law duty. The liability of a child to support its parents, who are infirm, destitute, or aged, is wholly created by statute ∗ ∗ ∗." 16 Johns at 285.[7] Though this language is dicta in the case, it appears to have influenced the Field Code drafters.

By 1863 in New York the duty was said to encompass adult incapacitated children as well. *Cromwell v. Benjamin,* 41 Barb 558 (NY Sup Ct 1863), held a father liable to a third person who supplied necessaries to his minor son and his adult daughter who was unmarried and "an invalid unable to support herself by her labor." 41 Barb at 561. The court compared the parental obligation of support to the common law duty requiring a husband to support a wife.

We have found no case squarely addressing the parental duty to support adult incapacitated children before 1854, the date of enactment of the predecessor to ORS 109.010. Whether the common law recognized a duty to support such children before this time is inconclusive. However, the language of the statute proposed in New York and adopted in this state indicates that "children" is not a term limited to those of minority age but rather connotes an ongoing relationship among family members.

## II.  CODIFICATION OF FAMILIAL OBLIGATIONS OF SUPPORT

The proposed New York Field Codes contain the first codification we are able to find of the familial duty of support outside the poor laws. These codes were the product of a commission directed by David Dudley Field between the years

---

[7] Other early cases drew a distinction between the common law duty of parents to support children and the statutorily created duty of children to support parents. *See Hillsborough v. Deering,* 4 NH 86 (1827); *Dawson v. Dawson,* 12 Iowa 512 (1861) (citing *Edwards v. Davis,* 16 Johns 281 (NY Sup Ct 1819)); *see also Belknap v. Whitmire,* 43 Or 75, 72 P 589 (1903).

1846 and 1865 formed to codify the law of New York. The codes are a restatement and reformation of then existing statutory and common law.

The success of the Field Codes is evidenced by the fact that they served as a model for many codification attempts elsewhere in the country, including one of the first Oregon codes in 1853. The Field Codes were organized into five separate codes: Code of Civil Procedure, Code of Criminal Procedure, Political Code, Penal Code and Civil Code. The New York laws regulating public support of the poor were allocated to the Political Code.[8] These laws, patterned after the Elizabethan statutes, included a relative responsibility statute which obliged parents, children and siblings to support each other.[9]

Another duty of support, limited to parents and children, appeared in the proposed Civil Code.[10] This duty provided: "It is the duty of the father, the mother, and the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability * * *." § 97 Ninth Report of the Field Commission, Completed Civil Code (1865). The drafters' reliance on existing caselaw is evident from the commentary that accompanied the final draft of the commission's report. The commentary explained:

> "The provisions of the Poor Laws declare the duty of parents and children to support each other (1 *R.S.* 614, § 1); but it is held that the obligation on the part of children is purely statutory, and no other remedy exists except that provided by proceedings under those laws. (Edwards v. Davis, 16 *Johns.*, 281). It is the object of this section to recognize the obligation as a ground of legal liability independent of those provisions. On the part of parents, the obligation is not now merely statutory (Cromwell v. Benjamin, 41 *Barb.*, 558). But in England it has been so held (Shelton v. Springett, 11 *C.B.*, 452; Mortimore v. Wright, 6 *M. & W.*, 488)." Commentary to

---

[8] tenBroek, *supra* at 308-09.

[9] Grandparents and grandchildren had been eliminated from the list of responsible relatives in the New York laws before the Field Commission began its work. *See NY* Sess. Laws 1821, ch CXVII, § 4, as amended by NY Rev Stats, ch XX, § 1, at 62 (2d ed 1835).

[10] tenBroek, *supra* at 311-12. This duty of support was never enacted into the New York laws.

§ 97, Ninth Report of the Field Commission, Completed Civil Code (1865).

This draft post-dates the enactment of the Oregon Code of 1853, as does the cited case of *Cromwell v. Benjamin, supra.* It provides, however, the fullest explanation of the intent of the Field Code drafters, an intent unaltered by the *Cromwell* decision. The drafters sought to create a parental duty to support children similar to that found in the poor laws but "independent of those provisions" and independently enforceable. The duty of support in the poor laws is based on the familial relationship, not the minority status of the child. The duty continues so long as the family member is in need.

These two separate duties of familial support appeared in the first code of Oregon. When the code commission[11] presented its report on the draft code to the Oregon Territorial Legislature in 1853, the duty now found in ORS 109.010 was placed among the civil laws, and the relative responsibility law, now ORS 416.061, was set forth under the heading "Support of the Poor," reflecting the Field Code format. Report of the Code Commissioners (1853) 41, 234. The laws were enacted in this format. Statutes of Oregon 1854, p. 360, 463. The placement of two duties of familial support in different sections of the code, one public in nature, the other civil and private, mirrors the independent development of the duties of support in the United States.

The relative responsibility statute, and the overall scheme of public support for the poor of which it is a part have been amended throughout the years[12] but the basic premise

---

[11] In 1853, the legislative assembly created a commission to prepare a draft code and elected James R. Kelly, Reuben P. Boise and Daniel R. Bigelow as commissioners. Kelly, *supra* at 189-90.

[12] In 1860 a second commission was established to revise the Oregon statutes, which effort resulted in the creation of the Deady Code. Deady included the Kelly Commission's relative responsibility statute in chapter 43, entitled "The Support of the Poor," without amendment. General Laws of Oregon, ch 43, § 2, p 846 (Deady 1845-1864). Chapter 43 also continued and expanded statutes regarding county support of paupers, apprenticeships for minors, burial of paupers, work hours and penalties for bringing paupers into the county. General Laws of Oregon, ch 43, §§ 4 through 10, p 847-48 (Deady 1845-1864). The first section of chapter 43 vested the county courts with "entire and exclusive superintendence of the poor in their respective counties." General Laws of Oregon, ch 43 § 1, p 846 (Deady 1845-1864).

In 1939, brothers and sisters were eliminated from the list of relatives liable for support and spouses were included in their stead. OCLA § 126-107 (Oregon Complied Laws Annotated).

that certain relatives are liable to relieve the public burden of support of the poor has remained unchanged. The obligation, originally enforced by counties, Statutes of Oregon 1854, p. 463, is now enforced by a state agency. ORS 416.100. The current relatives' responsibility statute is found under the Adult and Family Services title in the Recovery of Assistance Payments Chapter. ORS 416.061.[13] The statutes reflect changes resulting from administrative expansion.[14] However, despite the change in form and structure from the early Elizabethan poor laws, the purpose of relieving the burden for support of the poor through enforcement actions against relatives brought by the government on behalf of the public remains the same.[15]

ORS 109.010 has undergone no textual changes of substance. As originally enacted, it appeared under the title parents and children together with laws regulating other relationships between guardians, wards, masters, apprentices and servants. Since the Deady Code, the statute has appeared among the Domestic Relations laws. General Laws of Oregon, ch 12, p 679 (Deady 1845-1864).

## III.  APPLICATION TO THIS CASE

### A.  *Exclusivity of existing statutory procedures*

■  From this background it can be seen that the parents' duty of support in ORS 109.010 stated a legal obligation recognized by many American states. To the extent that the duty derives from common law, it was capable of enforcement even before some states codified it. Oregon took over that codification in what is now ORS 109.010. Father argues that the legal obligation, standing alone, is not enforceable in the

---

[13] ORS 416.061(1) provides:

"The living relatives [defined in ORS 416.010(4) as "the husband, wife, father, mother, son or daughter 21 years of age or over"] of any needy person are hereby made liable to such person for monthly contributions of money not to exceed total cost in accordance with [the Relatives' Contribution Scale as set forth by statute].

[14] In 1953, the relative's liability for support was to be calculated on the basis of a contribution scale set by statute. Former ORS 411.430. Further, the 1953 revision centralized the public welfare system in a State Public Welfare Commission in place of county administration. Former ORS 411.460.

[15] It was not until 1953 that our public welfare laws provided the needy person a direct cause of action against relatives liable for support. Former ORS 411.450.

absence of explicit enforcement procedures and that enforcement procedures that exist now by statute limit the duty of support.[16] This argument would only be correct if the legislature, when it enacted the obligation, prescribed a particular method of enforcement at the same time, or if the legislature later enacted enforcement procedures intended to be exclusive.

■     As originally enacted, there was no statutory enforcement procedure included with the reciprocal duty of support. In *Paxton v. Paxton,* 150 Cal 667, 89 P 1083 (1907), an action by an invalid adult son against his father for support under the California equivalent of ORS 109.010, Cal Civ Code § 206, the court rejected an argument similar to father's with the following rationale:

> "It will be observed that section 206 of the Civil Code does not provide any procedure or machinery for enforcing its provisions, and no special procedure is prescribed elsewhere. On account of this absence of procedure appellant contends that there is no method by which section 206 can be judicially enforced. According to this contention said section is merely an ornamental enunciation of a moral principle which ought to be observed by good people under the circumstances referred to in the section, but it is not a law in the sense of a rule of action which such people are legally bound to obey. We do not think that this conclusion is maintainable. It may be admitted that where a statute creates a right and also prescribes a particular remedy or procedure for its enforcement, such procedure can alone be invoked for such enforcement; but that is as far as the rule goes. In such case the special

---

[16] Father's search for explicit enforcement procedures separate from the legal obligation of support is reminiscent of the now discarded English procedural requirement for forms of action. One writer described the forms of action of the English common law courts of the nineteenth century as follows:

"[The common law courts'] action system, comparable only to the most ancient Roman — that of the *legis actiones* — offers to the intending plaintiff a variety of pigeonholes rigidly partitioned, each for the reception of a particular manner of demand. If he chooses the wrong one, disaster may be the result. * * * These pigeonholes represent the forms of action, brought into being by the royal letters known as the original writ, crystallized into precedent by the end of the *Registrum Brevium.* Aforetime they were highly numerous; time and change have reduced their active list to a comparatively small group. Debt, covenant, assumpsit, trespass, trespass on the case, trover, detinue, replevin, ejectment, find frequent employment. A few others occasionally appear, but those named are the everyday actions, principal survivors of a once mighty host." Millar, *Civil Procedure of the Trial Court in Historical Perspective* 32 (1952).

procedure may be considered as part of the right — limiting and conditioning it, but where the right is given by statute without any prescribed remedy, it may be enforced by any appropriate method recognized by the general law of procedure. * * *" 150 Cal at 670.

The same analysis applies here. As enacted, the duty was not "limited" or "conditioned" by a particular method of enforcement. Whether the duty has been subsequently limited requires an examination of amendments to the domestic relations statutes.

■　　It was not until 1930 that statutes regulating the juvenile, county and domestic relations courts were included with the domestic relations statutes. 2 Oregon Code Annotated (1930) § 33-635. A new statute in this section authorized the juvenile courts to order a parent to support a neglected or abandoned child. In 1953, the domestic relations code assumed the structure it maintains today. Laws regulating marriage, dissolution, the relationship between husband and wife and parent and child, as well as provisions for the enforcement of support laws, were compiled in the same title. ORS chapters 106 through 110. Some of these provisions authorizing support were simply gathered from other sections of the code to be grouped under one title encompassing all of domestic relations law and procedure. *See, e.g.,* ORS 107.095 authorizing support pending dissolution, ORS 107.105 authorizing future support, ORS 108.110 authorizing support to a married person. Newer provisions address the support obligation in specific instances. *See, e.g.,* ORS 107.108 authorizing support for children over 18 but still in school, ORS 109.153 through 109.155, authorizing support in filiation proceedings, ORS chapter 110, the Revised Uniform Reciprocal Enforcement of Support Act. We find no indication, however, that either the process of collecting the law and procedure of domestic relations into one code section or enactment of newer provisions to address the obligation of support in specific instances was intended to preclude other remedies that already existed.

This court's examination of the duty imposed in ORS 109.010 has occurred infrequently and often in dicta. In general, however, we have recognized that the statute imposes a legal obligation on parents to support their children. *See*

*Coastal Adjustment v. Wehner,* 246 Or 115, 423 P2d 967 (1967); *State v. Langford,* 90 Or 251, 259, 176 P 197 (1918); *Putnam v. Southern Pacific Co.,* 21 Or 230, 240, 27 P 1033 (1891); *but see Carney v. Barrett,* 4 Or 171 (1871).

We considered whether the duty of parental support could be enforced by a third person in *Coastal Adjustment v. Wehner, supra.* In that case, a creditor who supplied necessaries to minor children on the order of their divorced mother sought reimbursement from the divorced father. The trial court found for the creditor and this court reversed. We stated: "Oregon statutes require parents to care for their children 'who are poor and unable to work to maintain themselves,' and enjoin a reciprocal duty upon children. ORS 109.010." 246 Or at 116. The court, however, found that the controlling statute was ORS 107.100, which deals with child support after divorce, and cited ORS 107.130 as a statute empowering the courts to modify a support provision in a divorce decree when necessary. The court refused to allow the creditor to recover directly from the divorced father because to do so would permit one parent "to modify the decree merely by purchasing necessaries on credit." 246 Or at 117.

■ Where a statutory procedure exists by which to seek support, that is the method a litigant must pursue. However, nothing in *Wehner* nor the statutes themselves prohibits a child to whom the duty is owed from enforcing the duty of support through a direct action against his or her parent under ORS 109.010, where no other method is provided by statute.

## B. Majority of Child

■ Father asserts that the duty of support found in ORS 109.010 extends to and may be extracted from minor children only. We disagree. The word children is used in both clauses of ORS 109.010. The word only has meaning in the second clause if it encompasses adult chilldren. The failure to differentiate between adult children and minor children in the two clauses suggests that the drafters had all children in mind. In addition, the same term, children, was used in the Elizabethan poor laws and now appears in the statutes regulating the public duty of support. There it connotes relationship, rather than age. The same meaning applies to the word as used in the enactment of the private duty of support.

Other states have recognized that the parental duty of support extends to adult incapacitated children. *Crain v. Mallone,* 130 Ky 125, 113 SW 67 (1908), held that an incompetent adult son's share of his mother's estate should not be reduced by the amount of support his mother provided him during his majority. The court stated:

> "The duty and obligation of a parent to care for his offspring does not terminate when the child arrives at age or becomes an adult; nor is it limited to infants and children of tender years. An adult child may from accident or disease be as helpless and incapable of making his support as an infant, and we see no difference in principle between the duty imposed upon the parent to support the infant and the obligation to care for the adult, who is equally, if not more, dependent upon the parent. In either case the natural as well as the legal obligation is the same, if the parent is financially able to furnish the necessary assistance." 130 Ky at 129-30.

In *Schultz v. Western Farm Tractor Co.,* 111 Wash 351, 190 P 1007 (1920), the court upheld the amount awarded to an adult incompetent son for the wrongful death of his father, under the theory that the father owed a duty of support to his son so long as the son was disabled:

> "Doubtless the legal duty of a parent to support his normal children ceases at the age of majority, but the rule is not the same with respect to his defective children, whether the defect be mental or physical. To these be owes a continuing obligation of support, which ceases only when the necessity for support ceases." 111 Wash at 354.

Similarly, in *Borchert v. Borchert,* 185 Md 586, 45 A2d 463 (1946), the court indicated that the parents' duty of support extended to an adult handicapped child, but modification of a decree of child support was not the appropriate procedure by which to enforce the duty. In dictum, the court acknowledged:

> "The doctrine of liability in a father to support an incapacitated adult child seems to have permeated the courts of this country, in many cases without any statutory enactment to support it. The obligation is set out in a great many cases, often in those judicial expressions known as *obiter dicta.* * * * However vague and unsatisfactory such statements are, it must be concluded, in view of the many decisions so holding, that there is now a tendency in this country, whether based upon local statutes or upon a modern judicial expansion of the

common law, to recognize a duty imposed upon a parent to support his incapacitated child." 185 Md at 591-92.

*Prosser v. Prosser,* 159 Kan 651, 157 P2d 544 (1945), is almost identical to the instant case. Mother sued on behalf of her 22 year old incapacitated daughter for support from the child's father. The court granted relief, describing the action as one to enforce a common law duty of a parent to support and maintain his children. The court stated: "It is a generally accepted rule that where a child on becoming of age is in such a feeble and dependent condition physically or mentally as to be unable to support himself the parental obligations and duties toward such a child remain unchanged." 159 Kan at 653.

## C. Conclusion

A duty of support appears among our earliest laws. No limitations were placed on the enforcement of that duty when it was first enacted, nor have any been imposed with subsequent admendments. We hold that a statutory duty of parental support exists and may be enforced in a direct action by this mentally handicapped adult child against his parent. The trial court below properly allowed the child to maintain an action against his father and awarded support.

The decision of the Court of Appeals is reversed. The decision of the trial court is reinstated.