No. 7 February 8, 2018 431

IN THE SUPREME COURT OF THE
STATE OF OREGON

Kerry TOMLINSON
and Scott Tomlinson, individually; and
Kerry Tomlinson as guardian *ad litem* for
her minor son Edward Tomlinson,
*Respondents on Review,*

*v.*

METROPOLITAN PEDIATRICS, LLC,
an Oregon limited liability corporation;
Legacy Emanuel Hospital & Health Center,
dba Legacy Emanuel Pediatric Development and
Rehabilitation Clinic; and Mary K. Wagner, M.D.;
*Petitioners on Review,*

*and*

LEGACY EMANUEL HOSPITAL & HEALTH CENTER,
an Oregon non-profit corporation,
dba Legacy Emanuel Health Center;
and Sharon D. Butcher, CPNP,
*Defendants.*

(S063902) (Control)

Kerry TOMLINSON
and Scott Tomlinson, individually and
Kerry Tomlinson as guardian *ad litem* for
her minor son Edward Tomlinson,
*Petitioners on Review,*

*v.*

METROPOLITAN PEDIATRICS, LLC,
an Oregon limited liability corporation;
Legacy Emanuel Hospital & Health Center,
dba Legacy Emanuel Pediatric Development and
Rehabilitation Clinic; and Mary K. Wagner, M.D.,
*Respondents on Review,*

*and*

LEGACY EMANUEL HOSPITAL & HEALTH CENTER,
an Oregon non-profit corporation,
dba Legacy Emanuel Health Center

and Sharon D. Butcher, CPNP,
*Defendants.*

(S063956)

(CC 110911971; CA A151978;
SC S063902(Control), S063956)

On review from the Court of Appeals.*

Argued and submitted November 15, 2016.

Michael J. Estok, Lindsay Hart, LLP, Portland, argued the cause and filed the briefs for petitioners on review/respondents on review Metropolitan Pediatrics, LLC, and Mary K. Wagner, MD. Lindsey H. Hughes, Keating Jones Hughes, P.C., Portland, argued the cause and filed the briefs for petitioner on review/respondent on review Legacy Emanuel Hospital & Health Center. Also on the briefs was Hillary A. Taylor, Portland.

Kathryn H. Clarke, Portland, argued the cause and filed the briefs for respondents on review/petitioners on review Kerry Tomlinson and Scott Tomlinson. Also on the briefs were William A. Gaylord, Linda K. Eyerman, and Craig A. Nichols, Portland.

Travis Eiva, Eugene, filed the brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Before Balmer, Chief Justice, and Kistler, Walters, Nakamoto, and Flynn, Justices, and Brewer and Landau, Senior Justices pro tempore.**

BREWER, S. J.

The decision of the Court of Appeals is affirmed, and the judgment of the circuit court is affirmed in part and reversed in part.

Walters, J., filed an opinion concurring in part and dissenting in part, in which Kistler, J., joined.

_____

\*   Appeal from Multnomah County Circuit Court, Jean Kerr Maurer, Judge. 275 Or App 658, 366 P3d 370 (2015).

\*\*   Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case. Duncan and Nelson, JJ., did not participate in the consideration or decision of this case.

**BREWER, S. J.**

This is an appeal from a trial court judgment dismissing plaintiffs' complaint under ORCP 21 A(8) for failure to allege facts sufficient to state claims for relief. Plaintiffs Kerry and Scott Tomlinson (the parents) and their son, T, brought separate negligence claims against defendants Mary K. Wagner, MD., Metropolitan Pediatrics, LLC, and Legacy Emanuel Hospital & Health Center. In their respective claims, the parents and T alleged that defendants provided medical services to the parents' older son, M, failed to timely diagnose M's genetic disorder, and failed to inform the parents of that disorder.[1] In addition, the parents and T each alleged that "[the parents] relied on the defendants, and each of them, to exercise reasonable care, skill and diligence on their behalf" and that "defendants had an ongoing duty to properly diagnose [M's] condition from November 16, 2004 until the diagnosis of Duchenne's muscular dystrophy [DMD] was finally made in October 2010." The parents and T further alleged that, "[h]ad defendants, and each of them, timely diagnosed [M's] DMD, [the parents] would not have produced another child suffering from [DMD]." The parents and T each alleged that defendants' negligence caused them to suffer economic and noneconomic damages.

The trial court entered a judgment dismissing the complaint on the ground that neither the parents nor T were patients of defendants and, therefore, the court reasoned, defendants owed no obligation of professional care toward them. The Court of Appeals reversed that judgment as to the parents but affirmed as to T. For the reasons stated below, we affirm the decision of the Court of Appeals, and we reverse in part and affirm in part the trial court judgment dismissing this action.

## I. BACKGROUND

In reviewing a judgment dismissing a complaint under ORCP 21 A(8), we assume the truth of all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those allegations in favor of plaintiffs. *Deckard v. Bunch*, 358 Or 754, 757, 370 P3d 478 (2016). We

---

[1] The complaint did not assert a negligence claim on behalf of M.

set out the pertinent allegations in the complaint in accordance with that standard.

The parents' son, M, was born in 2003. The parents took M to defendants for patient care in November 2004 after he began exhibiting developmental abnormalities. Over the course of many visits, defendants "undertook to assess the cause of [M]'s developmental abnormalit[ies]," but failed to do so. While still not knowing the cause of M's continuing developmental abnormalities, the parents conceived another child in early 2008. That child, T, a son, was born in November 2008.

In October 2010, the cause of M's developmental abnormalities was diagnosed as Duchenne muscular dystrophy (DMD). According to the complaint, DMD is an inheritable genetic disorder with severe and progressively debilitating symptoms, including muscle weakness and wasting, loss of the ability to walk (usually by age 12), progressive paralysis, and premature death. Those symptoms typically affect only males with the defective gene. Females with the defective gene are typically only carriers who do not show symptoms of DMD. If a couple has a child with DMD, then there is a fifty-percent chance that other male children born to that couple will also have DMD. After M's diagnosis, T also was diagnosed with DMD.

In their respective claims, the parents and T alleged that defendants negligently failed to perform appropriate diagnostic testing for the symptoms that M was presenting and, therefore, failed to timely diagnose M with DMD. According to the parents and T, because defendants failed to timely diagnose M, defendants failed to timely inform the parents of the reproductive risks resulting from M's diagnosis. As noted, the parents and T alleged that if defendants had "timely diagnosed [M]'s DMD, [the parents] would not have produced another child suffering from [DMD]."

The parents and T further alleged that, as a result of defendants' negligence, they have suffered significant financial and emotional burdens. Specifically, the parents sought economic damages for the cost of T's medical care, education, and other support that they have already incurred and expect to incur until he reaches adulthood. They also sought

noneconomic damages for emotional distress. T separately sought economic damages for his medical care and support in adulthood and for his lost future earning capacity. Like the parents, T also claimed noneconomic damages for emotional distress.

In the trial court, defendants moved to dismiss both claims under ORCP 21 A(8). Defendants asserted numerous reasons for dismissal. As noted, the trial court granted the motion on the ground that neither the parents nor T alleged that they had been patients of defendants. In an initial letter opinion, the trial court characterized the complaint as asserting medical negligence claims and explained that, "to survive dismissal, a complaint must include an allegation of a professional relationship between a physician and patient in a medical negligence case." Because the parents and T had conceded that only the parents' first-born son, M, had been defendants' patient, the trial court therefore dismissed both claims. The court also ruled that T's claim was not actionable because "there is no yardstick by which to measure his damages."

In a subsequent letter opinion, the trial court clarified that its dismissal of T's claim was based on the premise that Oregon law does not recognize a claim by a child asserting that he or she never should have been born. The court explained that it was dismissing the parents' claim because, unlike similar claims recognized in other jurisdictions, the complaint in this case did not allege that "the parents [were] treated with, or relied upon, the advice of [defendants] in deciding whether to conceive a second child." The trial court further ruled that, even if the parents had alleged sufficient facts to state a claim for relief, such a claim could not include noneconomic damages for emotional distress, because "[n]o physical impact or duty to plaintiffs to avoid emotional harm has been alleged." Based on those rulings, the trial court entered judgment in favor of defendants.

Plaintiffs appealed that judgment to the Court of Appeals, which affirmed the dismissal of T's claim but reversed the dismissal of the parents' claim, including the dismissal of their request for noneconomic damages. *Tomlinson v. Metro. Pediatrics, LLC*, 275 Or App 658, 366

P3d 370 (2015). In its analysis, the Court of Appeals first addressed whether the trial court properly had dismissed the parents' and T's claims for failing to allege a physician-patient relationship. The Court of Appeals framed the issue as being whether "a plaintiff is categorically precluded from stating a negligence claim against a physician where the professional standard of care owed to a patient requires the physician to exercise care on behalf of nonpatients." *Id*. at 673. The Court of Appeals disagreed with the trial court's ruling on that issue, holding that "the absence of a physician-patient relationship [does] not preclude nonpatients from recovering in negligence against the physician." *Id*.

The Court of Appeals then addressed issues specific to the parents' claim. As relevant to our review, the Court of Appeals agreed with the trial court's conclusion that "there are no allegations of treatment, consultation, or reproductive or genetic counseling or screening involving the [parents]. Further, there are no allegations of affirmative misdiagnoses or representations on which the [parents] relied in deciding to conceive another child." *Id*. at 679 n 10. The court opined, however, that those omissions were not critical: "[W]here defendants negligently failed to diagnose [M] and failed to inform [the parents] of his genetic condition and [the parents'] reproductive risks, [the parents'] failure to allege that they inquired as to whether [M] might have a genetic condition so as to obtain some affirmative representation from defendants is not dispositive." *Id*. The Court of Appeals held that it was sufficient to allege that defendants "fail[ed] to diagnose the congenital or hereditary nature of [an older child's] ailment before the parents unknowingly conceived and bore a second child suffering from the same genetic condition." *Id*.

The Court of Appeals next addressed whether the parents sufficiently had alleged a basis to recover noneconomic damages for emotional distress. The court noted that, in the absence of a physical impact, "a plaintiff may recover for purely psychic injury 'where the defendant's conduct infringed on some legally protected interest apart from causing the claimed distress[.]'" *Id*. at 679 (quoting *Hammond v. Center Lane Communications Center*, 312 Or 17, 23, 816 P2d 593 (1991) (emphasis omitted)).

The court rejected the parents' contention that they could show a sufficient "physical impact" based on the physical activity required to care for T or their resulting increased susceptibility to physical injury. *Id.* at 680. But the court accepted the parents' contention that they had a legally protected interest in controlling their reproductive choices, the violation of which is actionable in a negligence claim. *Id.* at 681. The court held that "a relationship of reliance" could be established based on "the limited circumstances alleged here—*viz.*, circumstances in which a medical provider, under the operative standard of care, is obligated to inform the biological parents that their child (*i.e.*, the provider's patient) suffers from a genetic condition and to advise them as to the reproductive consequences of such a diagnosis." *Id.* at 684. As a result, the Court of Appeals held that the parents' relationship with defendants "gave rise to a duty to avoid infringing on the [parents]' interest in making informed reproductive choices." *Id.*

Further, the Court of Appeals concluded that such an interest is sufficient to support recovery for emotional injuries resulting from negligent conduct. According to the Court of Appeals, "there can be little doubt that informing parents of their child's genetic condition so that they can make informed reproductive decisions is an obligation imposed to avoid the severe emotional distress that is the direct consequence of its infringement." *Id.* at 686. The Court of Appeals viewed the parents' interest in making informed reproductive choices as implicating fundamental issues of personal autonomy, the violation of which "may be thought of as the deprivation of moral initiative and ethical choice." *Id.* at 686-87 (quotation omitted). Thus, the Court of Appeals held that the parents' allegations were sufficient to support the recovery of noneconomic damages for emotional distress.

Additionally, the Court of Appeals noted that one defendant had "moved to dismiss the [parents]' negligence claim on the ground that, because they could not recover noneconomic damages for emotional distress, their claim reduced to one of purely economic losses that are generally not recoverable in a negligence action." *Id.* at 687 n 14. The court rejected that argument "[f]or the same reasons that the trial court erred in dismissing the [parents]' negligence

claim on the ground that their allegations pertaining to noneconomic damages were legally insufficient." *Id.* Accordingly, the Court of Appeals concluded that the trial court had erred in dismissing the parents' negligence claim against defendants.

Turning to T's claim, the Court of Appeals explained that "[T] alleges that, but for defendants' negligence, he would never have been born. Thus, [T]'s alleged injury is life itself." *Id.* at 688. In adopting that view, the court rejected T's argument that his injury was the impairment that accompanies his life rather than his life itself. The court further concluded that, even if such impairment could be an injury, T had failed to state a negligence claim against defendants because T had not alleged legally cognizable damages. According to the Court of Appeals, calculating T's alleged damages would be an impossibility:

> "As applied to [T]'s claim, a trier of fact would be required to compare the value of nonexistence—the state that [T] would have been in but for defendants' alleged negligence— and the value of his life with DMD. Simply put, as a matter of law, that comparison is impossible to make."

*Id.* at 689. The Court of Appeals therefore affirmed the part of the judgment dismissing T's claim.

In sum, the Court of Appeals ruled in favor of the parents on their claim and in favor of defendants on T's claim. Both T and defendants petitioned for review of the Court of Appeals' rulings that were adverse to their respective positions. This court allowed both petitions.

## II.   ANALYSIS

As discussed, in reviewing the trial court's ruling dismissing plaintiffs' complaint under ORCP 21 A(8), we "assess[] the legal effect" of the factual allegations in the complaint and all reasonable inferences that may be drawn from those allegations. *Bailey v. Lewis Farm, Inc.*, 343 Or 276, 281, 171 P3d 336 (2007). Whether the facts alleged are sufficient to state a claim for relief is a question of law. *See Rowlett v. Fagan*, 358 Or 639, 651, 369 P3d 1132 (2016) ("[T]he legal viability of any particular claim under Oregon law *** is strictly a matter of law.").

To answer that question in this negligence action, our task "is to 'determine whether upon the facts alleged * * * no reasonable factfinder could decide one or more elements of liability'" in favor of plaintiffs. *Chapman v. Mayfield*, 358 Or 196, 205, 361 P3d 566 (2015) (quoting *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987)). The primary dispute in this case is narrow. Defendants do not dispute that the parents and T alleged facts that could establish that defendants' conduct was a but-for cause of the injuries for which they seek redress. Defendants also do not dispute that the parents and T alleged facts that could establish that defendants' conduct was negligent for failing to diagnose the genetic disorder of their patient, M, in a timely manner and failing to communicate that diagnosis to the parents. Instead, the primary dispute on review is about whether the parents and T had identifiable interests that defendants were legally obligated to protect under the facts alleged in their respective claims. *See Cain v. Rijken*, 300 Or 706, 715, 717 P2d 140 (1986) ("[A] defendant generally will be liable to plaintiff for negligently caused injuries only if the plaintiff and the injury are of a kind foreseeably within the scope of the risk that made the conduct negligent."); *see also Chapman*, 358 Or at 206 (asking "whether plaintiffs' injuries were within the type of potential harms that made defendant's conduct unreasonable").

Defendants concede that, as defendants' patient, M had a legally protected interest in receiving reasonable medical care from defendants, which, based on the facts alleged, included timely diagnosing his genetic disorder and communicating that diagnosis to his parents. So, as alleged, defendants do not dispute that the complaint alleged sufficient facts to establish that defendants acted negligently with respect to M's legally protected interests. The question is whether the parents and T also alleged sufficient facts to establish that defendants infringed their own legally protected interests, despite their lack of a physician-patient relationship with defendants. In other words, the question is whether the complaint alleged sufficient facts to establish that defendants' conduct was negligent with respect to the legally protected interests of the parents and T. Again, that determination is a question of law. *See, e.g.*, *Conway v. Pacific*

*University*, 324 Or 231, 239, 924 P2d 818 (1996) (reviewing nature of parties' relationship to determine whether plaintiff had stated claim for negligence). We separately consider that issue with regard to the claims asserted by both the parents and by T, as well as defendants' arguments that the parents cannot recover damages for emotional distress and that T did not suffer cognizable harm in the first place.

A. *The Parents' Claim*

Stated in core terms, the parents assert that defendants negligently failed to diagnose M's genetic disorder in a timely manner and to communicate that diagnosis to the parents, and that defendants' negligence caused the parents to conceive and bear T and suffer the economic and emotional burdens associated with T's genetic disability.[2] Defendants first contend that the parents have not stated a negligence claim because defendants had no obligation to protect the parents from the injuries that they suffered. Defendants further contend that, even if the parents have stated a negligence claim, the parents cannot recover damages for emotional distress.

1. *Whether the parents' allegations adequately state a negligence claim*

Claims such as the parents' claim sometimes have been challenged on the ground that the law should not recognize having a child as an injury. This court, however, considered and rejected that argument in *Zehr v. Haugen*, 318 Or 647, 871 P2d 1006 (1994). There, parents sued a physician who was supposed to perform a tubal ligation on the wife at the time of the Caesarean delivery of the couple's second child. *Id.* at 650. The physician negligently failed to perform the tubal ligation and, as a result of that negligence, the wife became pregnant and gave birth to the couple's third child. *Id.* In their negligence claim, the parents sought damages for the economic losses and emotional distress associated

---

[2] The parents' claim is a version of what has been described by some courts and commentators as a "wrongful birth" claim, in which a parent asserts that a health care professional's allegedly negligent conduct prevented the parent from avoiding or terminating a pregnancy that resulted in the birth of a disabled child. *See Willis v. Wu*, 362 SC 146, 153, 607 SE2d 63, 66 (2004) (defining "wrongful birth" and warning that term is not always used consistently).

with raising that child. The defendant argued that "the birth of a healthy, normal child cannot be 'harm.'" *Id.* at 657. This court rejected that argument, holding that, "[w]hen a plaintiff alleges that a negligently performed medical procedure produced an outcome that was harmful to the plaintiff, the plaintiff is entitled to present evidence concerning that alleged harm." *Id.*

*Zehr* established the viability—at least in theory—of a parental claim asserting that a health care provider's conduct prevented the avoidance or termination of a pregnancy. Defendants, however, argue that the parents' claim cannot be based on the foreseeability of the injuries alone and that the parents' claim is a type of medical malpractice claim that requires a direct physician-patient relationship between the parties. Defendants point out, and the parents concede, that only M had a physician-patient relationship with defendants.[3]

We begin with defendants' contention that the foreseeability of the parents' injury cannot, by itself, establish defendants' liability for the parents' injuries. We agree with defendants for two reasons. First, the parents allege only economic and emotional injuries. *See Philibert v. Kluser*, 360 Or 698, 703, 385 P3d 1038 (2016) ("[T]he [emotional] injury's foreseeability, standing alone, is insufficient to establish the defendant's liability: there must also be another 'legal source' of liability for the plaintiff to recover emotional distress damages."); *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004) ("[L]iability for purely economic harm must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." (Internal quotation marks omitted.)). Second, the parents allege that their injuries resulted from defendants' failure to take affirmative steps to protect them

---

[3] In *Zehr*, this court allowed both the husband and wife to proceed on negligence claims against the wife's physician. 318 Or at 657. But the court was not asked to consider, and did not consider, the issue of whether the husband's status as a nonpatient precluded his claim. *See Tomlinson*, 275 Or App at 673 n 7 ("[B]ased on our review of the appellate briefs in *Zehr*, the issue of whether husband was required to allege a physician-patient relationship between defendants and himself was not before the courts.").

from a risk of harm that defendants did not create—namely, the reproductive risks associated with the parents' preexisting genetic composition. *See Restatement (Third) of Torts: Phys. & Emot. Harm* § 37 (2012) ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable."); *see, e.g., Cramer v. Mengerhausen*, 275 Or 223, 227, 550 P2d 740 (1976) ("There is no duty to aid one in peril in the absence of some special relation between the parties which affords a justification for the creation of a duty."). Defendants correctly note that, without some justification for providing legal protection, a person is not generally required to affirmatively protect the economic and emotional interests of others.

Contrary to defendants' argument, however, the lack of a direct physician-patient relationship does not defeat the parents' claim. A direct physician-patient relationship can be *one* ground for creating affirmative protections of a plaintiff's economic and emotional interests under negligence law. *See, e.g., Curtis v. MRI Imaging Services. II*, 327 Or 9, 15, 956 P2d 960 (1998) (allowing claim for emotional distress); *Zehr*, 318 Or at 658 (allowing claim for economic losses); *Restatement (Third)* § 41 comment h ("[A physician's duty to a patient] encompasses both the ordinary duty not to harm the patient through negligent conduct and an affirmative duty to use appropriate care to help the patient."). It does not necessarily follow that a direct physician-patient relationship is the *only* such ground available to the parents.

To determine whether the parents have asserted a cognizable ground for protection of their interests, it is helpful to identify the foundational principles that this court has used to describe professional undertakings that can give rise to negligence liability. In *Conway*, this court explained:

"Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party. This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party

who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution."

*Conway*, 324 Or at 240 (emphasis in original); *see also* Dan B. Dobbs *et al*, 2 *The Law of Torts* § 410, 670 (2d ed 2011) ("Special relationships may also arise from voluntary contracts or undertakings.").

Of course, those broad principles support the obligation of professional care that a physician owes to a patient. When a physician holds herself out as such and undertakes to provide medical services, the physician represents having a certain level of medical skill and competence, often in a particular medical discipline. In doing so, the physician invites a patient (or others acting to advance the patient's interests) to rely on the physician to provide the patient with the level of care that a reasonably prudent, careful, and skillful practitioner of the physician's discipline would have provided to the patient under the same or similar circumstances and within the same community. *See Creasey v. Hogan*, 292 Or 154, 163, 637 P2d 114 (1981) (stating a physician's standard of care); *Dowell v. Mossberg*, 226 Or 173, 190, 359 P2d 541 (1961) (explaining that an "unspoken contractual relationship between a physician and patient is a matter of inducement in a malpractice action"). The law therefore imposes on a physician an obligation to meet that standard of care, which is defined by the scope of the physician's undertaking. *See* Dobbs *et al*, 2 *The Law of Torts* § 285 at 137-38 ("In the usual case, the doctor-patient relationship is formed by the doctor's undertaking to act for the benefit of the patient or with her express or implied consent or that of her representative. The duty is of course limited by the scope of the undertaking.").

As noted, though, the parents were not defendants' patients. Defendants argue that a physician can never be subject to a professional obligation to a nonpatient because, according to defendants, the very essence of medical services is to diagnose and treat *patients* and not to benefit nonpatients. Although this court has not had occasion to consider that categorical argument in the context of a physician's

services, it has rejected similar arguments in the context of other professional relationships and has, in appropriate circumstances, recognized third-party professional negligence claims.[4]

For example, in the context of legal malpractice claims, strict adherence to the privity rule has been abandoned, and courts have "extended the attorney's duty to third parties on a case-by-case basis[.]" *Roberts v. Fearey*, 162 Or App 546, 551, 986 P2d 690 (1999). Like in other professional settings, the recognition of nonclient legal malpractice claims has turned on the existence of an undertaking, express or implied, between the attorney and the third party:

> "Although Oregon has not formally adopted a discrete test, the cases in this area focus on whether there is a *de facto* relationship between the defendant and the injured nonclient of a nature that justifies imposing a special duty on the defendant to protect the nonclient against economic losses."

*Id.* at 552; *see, e.g.*, *Hale v. Groce*, 304 Or 281, 744 P2d 1289 (1987) (allowing plaintiff-nonclient to bring malpractice claim as intended third-party beneficiary of attorney's relationship with client); *McEvoy v. Helikson*, 277 Or 781, 562 P2d 540 (1977) (allowing plaintiff-nonclient to sue his former wife's attorney for violating stipulated agreement because fact finder could conclude "the primary purpose" of agreement was to benefit plaintiff).

In short, in appropriate circumstances, this court has been willing to recognize that, in carrying out a professional obligation to a client, the professional may be required to protect the interests of a third party as well. In such circumstances, the professional's relationship with a client not only gives rise to an obligation to protect the interests of the client, but it also can give rise to an obligation to protect the interests of a third party. The facts of particular cases will determine what interests and what third parties receive such protection. But we can discern no reason to categorically exclude physicians from potential claims of third-party

---

[4] *See* Jay M. Feinman, *Professional Liability to Third Parties* 8-19 (2000) (describing historical development of third-party professional negligence claims).

professional negligence that are available against other professionals.

As noted, we decide on a case-by-case basis whether a professional's relationship with a third party is capable of supporting a negligence claim. We do not attempt to identify all possible factors that could be relevant in considering whether to recognize such a claim. But, as explained in *Conway*, an important consideration is whether the relationship between the parties is a type of relationship that generally entails a mutual expectation of service and reliance. We also have considered whether recognizing such a claim would interfere with or impair the loyalties that the professional owes to the client. *See Hale*, 304 Or at 287 (recognizing a duty to a third party because, among other reasons, "it does not threaten to divide a lawyer's loyalty between the client and a potentially injured third party"). And, as in other circumstances involving liability for economic and emotional injuries, we have considered whether the potential plaintiffs were identifiable to the defendant or otherwise could be defined as a class that avoids indeterminate liability. *See Philibert*, 360 Or at 704 ("Emotional distress, like economic loss, ripples throughout society as a foreseeable result of negligent conduct. Without some limiting principle in addition to foreseeability, permitting recovery for emotional injuries would create indeterminate and potentially unlimited liability.").

With those considerations in mind, we examine the parents' factual allegations. The parents alleged that defendants undertook to diagnose M's symptoms that, according to the parents, presented the potential of a genetic disorder. As M's legal guardians, the parents alleged that they expected to receive information from defendants about M's diagnosis. And as M's biological parents, the parents alleged that M's diagnosis potentially implicated their own genetic risks. Further, the parents alleged that they relied on defendants to exercise their professional skill and ability to diagnose M's symptoms and would not have conceived and born T if they had known of M's genetic disorder, a condition that they allege a physician of reasonable skill and ability would have diagnosed soon enough to avoid T's conception and birth.

We conclude that those factual allegations are sufficient, if proved, to establish that, in addition to their obligation to protect M's interests, defendants had a limited obligation to protect the parents' interests as well. Defendants' undertaking to provide medical care to M subjected them to a standard of care requiring the exercise of reasonable professional skill and care. Under the facts alleged, that standard required defendants to reasonably perform specific tasks: diagnose M's genetic disorder and communicate that diagnosis to the parents. The parents' relationship with defendants arose within the context of defendants' undertaking and the parents' status as M's biological parents and primary caregivers. We hold that, under the facts alleged in this case, such a relationship gives rise to legal protection. By failing to reasonably diagnose M's genetic disorder and communicate that diagnosis to the parents, defendants failed to reasonably protect M's interests in receiving medical care and failed to reasonably protect the parents' separate interests in avoiding the reproductive risks associated with their own genetic composition.

Nonpatients, including biological parents who are legal guardians and who are already in communication with a physician about their child's medical condition, reasonably may expect to receive warnings about potential risks to them that are germane to the physician's medical diagnosis of the child. Such expectations are especially reasonable for a potential biological parent in light of the important role that genetic information must play in reproductive decisions:

> "[A]dvancements in prenatal care have resulted in an increased ability of health care professionals to predict and detect the presence of fetal defects. This raises the importance of genetic counseling for expecting parents. Indeed, prenatal testing is extremely prevalent and is widely accepted, and will likely become more common in the future. Cailin Harris, *Statutory Prohibitions on Wrongful Birth Claims & Their Dangerous Effects on Parents*, 34 B.C. J.L. & Soc. Just. 365, 370 (2014) (recognizing that the American Congress of Obstetricians and Gynecologists recommends doctors test all pregnant women for genetic abnormalities)."

*Plowman v. Fort Madison Cmty. Hosp.*, 896 NW2d 393, 399 (Iowa 2017).

Further, under the facts alleged in the parents' claim, there was no possibility that defendants would be required to divide their loyalties between M and the parents. As alleged, the parents reasonably expected defendants to provide M with the level of care that a reasonably prudent, careful, and skillful physician otherwise would have provided to M. And, as further alleged, that level of care required performing (or referring M to others to perform) certain tests and sharing the results of those tests with the parents, as M's biological parents and legal guardians. Thus, satisfying the parents' reasonable expectations merely required defendants to provide M with the level of care that a reasonably prudent, careful, and skillful physician would have otherwise provided to M. And, because the parents were M's legal guardians, there was no concern about breaching M's privacy interests under the facts of this case.

The parents' claim to being entitled to receive warnings about their genetic reproductive risks may be analogized to cases in which negligence liability has been imposed on a physician for failing to warn nonpatient family members about the risks posed by a patient's contagious disease. *See* Dobbs *et al*, 2 *The Law of Torts* § 289 at 151 ("Liability to nonpatients has also been imposed when the physician fails to use reasonable care to discover and reveal that his patient has a contagious disease or a genetic condition that may represent harm to others."); *Restatement (Third)* § 41 comment h ("Courts generally have held physicians liable to nonpatient family members for failing to provide the patient with information about a communicable disease."); *see also Bradshaw v. Daniel*, 854 SW2d 865, 871 (Tenn 1993) (collecting cases that "have recognized that physicians may be liable to persons infected by a patient, if the physician negligently fails to diagnose a contagious disease, or having diagnosed the illness, fails to warn family members or others who are foreseeably at risk of exposure to the disease").

A physician may be required to warn a patient's family members about the risks of a contagious disease because doing so protects the interests of the family members, not because doing so protects the interests of the patient. *See Hofmann v. Blackmon*, 241 So 2d 752, 753 (Fla

Dist Ct App 1970) ("We hold that a physician owes a duty to a minor child who is a member of the immediate family and living with a patient suffering from a contagious disease to inform those charged with the minor's well-being of the nature of the contagious disease and the precautionary steps to be taken to prevent the child from contracting such disease and that the duty is not negated by the physician negligently failing to become aware of the presence of such a contagious disease."); *see also* Dobbs *et al*, 2 *The Law of Torts* § 289 at 151-52 ("The patient herself is entitled to have a proper diagnosis and to know of it so she can minimize risks to herself *and others*." (Emphasis added.)).[5]

The parents cite four decisions by other courts involving claims brought under facts similar to this case— namely, claims against a physician for the burdens of raising a subsequent child with a genetic disorder after the physician negligently failed to diagnose one of the parents' older children with the same genetic disorder. *See Clark v. Children's Memorial Hosp.,* 353 Ill Dec 254, 955 NE2d 1065 (2011); *Molloy v. Meier,* 679 NW2d 711 (Minn 2004); *Lininger v. Eisenbaum,* 764 P2d 1202 (Colo 1988); *Schroeder v. Perkel*, 87 NJ 53, 432 A2d 834 (1981).

The analysis in *Molloy* is particularly instructive. The court in that case emphasized that "genetic testing and diagnosis does not affect only the patient. Both the patient and her family can benefit from accurate testing and diagnosis. And conversely, both the patient and her family can be harmed by negligent testing and diagnosis." *Molloy*, 679 NW2d at 719. Further, the court explained that, because it is a common practice for physicians to warn the parents of any genetic diagnosis, "[t]he standard of care thus acknowledges that families rely on physicians to communicate a diagnosis of the genetic disorder to the patient's family." *Id.* The court also noted that recognizing the parents' protected interest was appropriate because "it is unlikely that the medical community will adopt a standard of care that is either unduly burdensome or unbeneficial to patients." *Id.*; *see also*

---

[5] Although there may be circumstances in which a physician could satisfy his or her professional obligation by advising the patient that family members should be informed of risks, there was no such possibility under the facts alleged here.

Dobbs *et al*, 2 *The Law of Torts* § 289 at 152 (noting that, in circumstances where nonpatient family members face a risk of a contagious disease or a genetic condition, "the duty of reasonable care is especially justified because it imposes no additional obligation of care beyond the duty the physician already owes to his patient"). As a result, the court in *Molloy* recognized that the parents there had a legally protected interest in being warned of any genetic diagnosis after considering the parties' mutual expectations of service and reliance, the extent of any additional burden that protecting the parents' interest would impose on the physician beyond the obligation already owed to the patient, and the likelihood that protecting the parents' interest would be detrimental the interests of the patient.

We reach the same conclusion here. The parents have alleged facts that, if proved, would be sufficient to establish that defendants and the parents had a mutual expectation that defendants would provide the parents with information that implicated the parents' right and ability to make informed reproductive choices, that meeting that expectation would not impose an undue burden on defendants beyond the obligation that they already owed to their patient, M, and that protecting the parents' interest would not be detrimental to the interests of M.[6] In addition, we

---

[6] Defendants argue that the decisions on which the parents rely are distinguishable because the physicians in each case made affirmative representations to the parents that the child whom the physicians treated did not have a genetic disorder, whereas there is no allegation of an affirmative representation in this case. As an initial matter, it is not correct that all the physicians in those cases made affirmative misdiagnoses. One of the physicians in *Molloy* made no such representations. 679 NW2d at 715. Instead, she was liable to the parents for failing to order or recommend genetic testing that the physician assumed incorrectly had been performed by previous physicians. *Id.* None of the courts concluded that the distinction between a misdiagnosis and a nondiagnosis was decisive, nor do we.

We further note that our decision is consistent with the Iowa Supreme Court's recent decision in *Plowman*, where the court ultimately concluded:

"The right to sue for wrongful birth belongs to parents who were denied the opportunity to make an *informed* choice whether to lawfully terminate a pregnancy in Iowa. It is not this court's role to second-guess that intensely personal and difficult decision. Parents of children with disabilities may find their lives enriched by the challenges and joys they confront daily. But under our tort law, financial compensation should be paid by the negligent physician if liability is proven."

896 NW2d at 410 (emphasis in original).

conclude that the facts that the parents have alleged adequately describe conduct by defendants that fell below the standard of care required to protect the parents' interest. *See Smith v. Providence Health & Services*, 361 Or 456, 480, 393 P3d 1106 (2017) (describing professional negligence as "conduct below the standard of care" necessary to satisfy the professional's obligation to the plaintiff).[7] Accordingly, we conclude that the parents have satisfied their pleading obligation to state a claim for negligence against defendants for purposes of ORCP 21 A(8).

2.  *Whether the parents can recover damages for emotional distress*

Although we have concluded that, as pleaded, the parents adequately stated a negligence claim against defendants, the question remains whether the damages that the parents seek are recoverable in such a claim. As pleaded, the parents seek both noneconomic damages for their emotional distress and economic damages for the expenses that the parents have and will incur as a result of T's genetic condition "through the remainder of his minority."

On review, defendants do not challenge the availability of economic damages in general, which the parents in *Zehr* were also allowed to seek. 318 Or 656-58. Because the issue has not been briefed and is not before us, we therefore have no opportunity to consider and determine the specifics types of economic damages that may or may not be recoverable on the parents' claim. *See, e.g.*, Daniel W. Whitney & Kenneth N. Rosenbaum, *Recovery of Damages for Wrongful Birth*, 32 J Legal Med 167, 173-88 (2011) (surveying scope of recoverable economic damages); Dobbs *et al*, 2 *The Law*

---

[7] In *Curtis*, this court held that the recoverability of emotional distress damages in a professional negligence claim not involving physical harm depends on the existence of a standard of care that includes the duty to protect a client from emotional harm. *Curtis*, 327 Or at 14; *see also Rathgeber v. James Hemenway, Inc.*, 335 Or 404, 415, 69 P3d 710 (2003) (describing *Curtis* as holding that, "to state a claim for emotional distress damages in a medical malpractice setting not involving physical harm, a plaintiff must plead and prove a standard of care that includes a duty to protect against psychic harm"). In this case, the primary issue is whether the parents, in addition to M., had their own legal interest in receiving genetic information that defendants were required to protect. If so, the standard of care needed to meet defendants' obligation to M. also would inform the standard of care needed to satisfy defendants' obligation to the parents.

*of Torts* § 370 at 491 ("The cases usually permit recovery of less than all of the costs inflicted by the tort by limiting the recovery to the 'extraordinary' expenses, those over and above the ordinary expenses of child rearing.").[8]

　　　Defendants have, however, raised the issue of whether the parents may seek noneconomic damages for emotional distress. Most of defendants' pertinent discussion, though, actually addresses the preceding question of whether the parents' claim is cognizable in the first place. *See, e.g.*, *Curtis*, 327 Or at 15 (considering whether to recognize patient's negligence claim premised on emotional injury). Generally, when a plaintiff establishes a cognizable negligence claim, damages are recoverable to the extent necessary to make the plaintiff whole. *See United Engine Parts v. Ried*, 283 Or 421, 432, 584 P2d 275 (1978) ("The purpose of awarding compensatory damages is to make the party entitled thereto whole." (Quotation omitted.)). Thus, although emotional distress is not always a sufficient injury to establish a negligence claim, if the plaintiff establishes a negligence claim based on physical injury or the invasion of some other legally protected interest, then, generally speaking, "the pain for which recovery is allowed includes virtually any form of conscious suffering, both emotional and physical." Dan B. Dobbs, 2 *Law of Remedies* § 8.1(4), 381 (2d ed 1993) (footnotes omitted); *see Philibert*, 360 Or at 702 (noting that damages for emotional distress are recoverable when plaintiff establishes a negligence claim based on physical injury or invasion of "some other legally protected interest"). In this case, the parents have alleged facts that, if proved, could establish a legally protected interest in receiving information from defendants that, based on M's genetic condition, implicated the parents' reproductive choices.[9]

---

[8] Moreover, because the parents have sought economic damages only for the period of T's minority, we are not required to consider whether the parents could recover economic damages for expenses that they may incur for T's care and maintenance after the age of majority.

[9] Those allegations distinguish this case from others in which the plaintiff alleges a professional standard of care that does not include an obligation to protect from emotional harm. *See, e.g.*, *Rathgeber*, 335 Or at 418 (holding that negligent performance of real estate or similar professional service "cannot give rise to emotional distress damages unless a standard of care that includes the duty to protect a client from emotional harm governs the professional's conduct.").

Despite that broad rule, some courts have prohibited the recovery of emotional distress damages even while recognizing a parent's claim against a health care professional for allegedly negligent conduct that prevented the parent from avoiding or terminating a pregnancy that resulted in the birth of a disabled child. *See* Whitney & Rosenbaum, *Recovery of Damages for Wrongful Birth*, 32 J Legal Med at 189-93 (recognizing split). The reasoning of those decisions does not persuade us.

Some courts have disallowed damages for emotional distress on the ground that parenthood should not be viewed as emotional harm. *See, e.g., Becker v. Schwartz*, 46 NY2d 401, 413-14, 386 NE2d 807, 813 (1978) ("While sympathetic to the plight of these parents, this court declined for policy reasons to sanction the recovery of damages for their psychic or emotional harm occasioned by the birth and gradual death of their child."). But allowing a parent to seek emotional distress damages does not require ignoring the emotional benefits that a parent may obtain from having a child. Instead, the jury may offset an award for emotional distress damages by the extent to which a parent receives emotional benefit from a child who resulted from a pregnancy that, but for the defendant's negligence, would have otherwise been avoided or terminated. *See Restatement (Second) of Torts* § 920 (1979) ("When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.").[10] Thus, "[m]ost courts appear to be more than willing to award damages for the parents' emotional distress, subject to offsets for emotional benefits the parents may gain in having the child." Dobbs, 2 *Law of Remedies* § 8.2 at 414. In considering the emotional benefits of parenthood, a jury might determine that the benefits more than offset

---

[10] Because the offset is limited to "the interest of the plaintiff that was harmed," *Restatement (Second)* § 920, consideration of emotional benefits cannot be used to offset economic injuries, *see* Whitney & Rosenbaum, *Recovery of Damages for Wrongful Birth*, 32 J Legal Med at 178 ("To be sure, wrongful birth cases may be found which permit juries to offset the benefits of parenthood against the extraordinary expenses attributable to caring for a severely impaired child. Yet these cases are in the distinct minority.").

the emotional distress, and award no emotional distress damages at all. But that is a fact issue for the jury and not a reason to prevent the parents from seeking such damages.

Other courts that have disallowed damages for emotional distress have relied on principles created to limit recovery for emotional distress, such as the physical-impact rule or the zone-of-danger rule. *See* Dobbs, 2 *Law of Remedies* § 8.2 at 414 (discussing limits and collecting cases); *see, e.g.*, *Bader v. Johnson*, 732 NE2d 1212, 1222 (Ind 2000) (allowing mother to recover emotional distress damages, but not father, because mother satisfied the physical-impact rule); *cf. Philibert*, 360 Or at 708-11 (discussing limits). Those rules, however, "have no logical bearing on the parents' wrongful birth claim." Dobbs, 2 *Law of Remedies* § 8.2 at 414. In such a claim, the parents

> "do not assert a freestanding emotional distress claim, but merely assert emotional distress as an item of damages for a personal tort. For these reasons, the physical manifestation and zone-of-danger rules offer no occasion to reject mental distress damages in wrongful birth cases any more than they would do so in the case of libel or invasion of privacy."

*Id.*; *see Clark*, 353 Ill Dec at 274-77, 955 NE2d at 1085-88 (reversing previous decision disallowing damages for emotional distress in wrongful birth cases); *Kush v. Lloyd*, 616 So 2d 415, 422-23 (Fla 1992) ("There can be little doubt that emotional injury is more likely to occur when negligent medical advice leads parents to give birth to a severely impaired child than if someone wrongfully calls them liars, accuses them of unchastity, or subjects them to any other similar defamation."); *Naccash v. Burger*, 223 Va 406, 416, 290 SE2d 825, 831 (1982) ("Furthermore, we believe it would be wholly unrealistic to say that the [parents] were mere witnesses to the consequences of the tortious conduct involved in this case."); *see also* Dobbs *et al*, 2 *The Law of Torts* § 370 at 492 ("The tort to the mother in the wrongful birth claim inescapably involves the mother's body and intimate rights of autonomy.").

In short, we agree with the majority of courts that have addressed the issue and conclude that the parents should be allowed to seek such damages in this case.

## B.  *T's Claim*

T's claim is based on the factual premise that, if defendants had not acted negligently, then T would not have been born.[11] The vast majority of courts that have considered the question have refused to recognize such claims. *See Willis v. Wu*, 362 SC 146, 156-57, 607 SE2d 63, 68-69 (2004) ("Twenty-seven states, by judicial opinion, statute, or both, have either refused to recognize or limited a wrongful life action. Three states *** have allowed such a cause of action."). And most courts that have refused to recognize such claims have done so after confronting the imponderability of comparing life to nonexistence. *Id.* at 157, 607 SE2d at 69 (collecting cases). That position, succinctly stated, is:

> "Our finding of such [a wrongful life] injury would require first, that we value [the child's] present station in life; second, that we ascertain the value to [the child] of his not having been born; and finally, that we determine that the latter value is greater than the former. Because we find it impossible to complete those steps in any rational, principled manner, we cannot find that [the child] has suffered an injury sufficient to support a claim for relief."

*Lininger*, 764 P2d at 1210.

Courts rejecting such claims have emphasized the difficulty in determining whether a plaintiff has been harmed at all by a defendant's negligence when, but for that negligence, the plaintiff would not have been born in the first place. *See id.* ("The difficulty that besets [the child's] complaint is not merely that damages are inherently too speculative to assess. While the discussion above compels that conclusion, the more fundamental problem is that we cannot determine in the first instance that [the child] has been injured."). In this case, the Court of Appeals rejected T's claim on similar grounds after concluding that T had alleged that his existence itself is an injury and that it is impossible to calculate damages based on a comparison between life and nonexistence. *Tomlinson*, 275 Or App at 689.

---

[11] T's claim therefore is a version of what some courts and commentators have termed a "wrongful life" claim. *See Willis*, 362 SC at 153, 607 SE2d at 66 (defining "wrongful life" and warning that term is not always used consistently).

On review, T primarily argues that the Court of Appeals erred by defining his injury as life itself rather than as the impairment that accompanies his life. T remonstrates that he has not sought damages whose calculation would require a comparison between life and nonexistence. Instead, he argues, he seeks damages based on a comparison between his impaired life and a nonimpaired life. T notes that, although such damages may be difficult to measure, juries are routinely asked to make similar calculations in cases involving prenatal injuries to a child that resulted in permanent disabilities. *See, e.g.*, *Klutschkowski v. PeaceHealth*, 354 Or 150, 156, 311 P3d 461 (2013) (permanent injury to child during delivery).

A threshold difficulty with T's argument is that it puts the damages cart before the liability horse; that is, T's argument blurs the line between the identification of a cognizable injury and the determination of damages resulting from the injury. "[T]he general rule in Oregon in assessing damages has been that a plaintiff should recover only such sums as will compensate a plaintiff for the injury suffered as a result of a defendant's wrong." *Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.*, 310 Or 333, 344, 798 P2d 656 (1990), *modified on recons,* 311 Or 88, 806 P2d 123 (1991). We must therefore first determine whether T has suffered a cognizable injury caused by defendants' negligence. Only then would T be entitled to have a finder of fact determine the damages needed to compensate that injury.

Contrary to T's argument, the comparison between life and nonexistence is inherent in determining both whether T suffered any harm as a result of defendants' conduct and whether any such harm constitutes a cognizable legal injury—that is, whether T's claimed injury is subject to legal protection against defendants' negligent conduct. As we now explain, those problems persist regardless how T frames the damages that he seeks.

To adequately state a negligence claim, a plaintiff must allege facts that would allow a reasonable factfinder to determine that the defendant's negligence caused the plaintiff harm. *See Solberg v. Johnson,* 306 Or 484, 490, 760 P2d 867 (1988) (stating that a negligence complaint "must allege

facts from which a factfinder could determine \*\*\* that the [defendant's] conduct was a cause of plaintiff's harm"); Dobbs *et al*, 1 *Law of Torts* § 125 at 391 ("[T]he plaintiff cannot recover without showing actual harm resulting from the defendant's conduct. Sometimes this is referred to as a requirement that the plaintiff must prove actual damages and sometimes as a requirement that the plaintiff must prove causation in fact." (Footnote omitted.)). As alleged in the complaint, T was born and was born with DMD as a result of defendants' conduct. The question remains, however, whether being born and being born with DMD constitutes harm that defendants caused.

Central to determining causation of harm is a comparison between what actually happened and what would have happened if the defendant had not engaged in the allegedly negligent conduct. *See* Dobbs *et al*, 1 *Law of Torts* § 187 at 626 ("The but-for test of causation can be applied only by comparing what happened with a hypothetical alternative."); *Restatement (Third)* § 26 (explaining that "[c]onduct is a factual cause of harm when the harm would not have occurred absent the conduct").[12] T contends that he can establish that defendants' conduct caused him harm without comparing the value of life to the value of nonexistence. According to T, the harm that defendants caused him is analogous to a prenatal injury to a fetus, which requires no comparison to nonexistence.

In the case of a prenatal injury resulting in disability, the plaintiff can establish harm based on a comparison between his or her life with the disability and his or her life without the disability, because the defendant actually caused the alleged disability. As a result, establishing harm from a prenatal injury does not require comparing life to nonexistence. For example, in *Mallison v. Pomeroy*, 205 Or 690, 291 P2d 225 (1955), a defendant negligently caused a traffic accident that resulted in the plaintiff being born with a disability. In that case, but for the defendant's negligence,

_____

[12] An exception is recognized when there are multiple sufficient causes of an injury, which is not alleged in this case. *See Restatement (Third)* § 27 ("If multiple acts occur, each of which under § 26 [but-for causation] alone would have been a factual cause of the physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm.").

the plaintiff would have born without the disability. The defendant, therefore, caused the plaintiff harm.

T's claim, however, is not analogous to a prenatal injury. It is true that, like the plaintiff in *Mallison*, T has alleged that defendants' negligence caused him to be born with a disability. But unlike the plaintiff in *Mallison*, T has not alleged that, but for defendants' negligence, T would have been born without the disability. Instead, as noted above, T has alleged that, "[h]ad defendants, and each of them, timely diagnosed [M's] DMD, [the parents] would not have produced another child suffering from Duchenne's muscular dystrophy." In short, as alleged, the alternatives for T were that he would be conceived and born with DMD or that he would not be conceived and born at all.

The comparison is not avoided merely because T has alleged that defendants caused him economic and emotional burdens. The role of nonexistence in that analysis is different depending on whether the damages that T seeks are deemed to be components of damages resulting from a physical injury or whether those burdens themselves constitute economic and emotional injuries. That distinction is highlighted by T's analogy to prenatal injuries. For a plaintiff who suffers a permanent impairment resulting from a prenatal injury, the impairment is a physical injury, and the financial and emotional burdens resulting from living with that impairment are components of damages needed to compensate for the physical injury.

T alleges that, as a result of defendants' negligence, his parents "unknowingly conceived and bore a child with a severe genetic defect," and that "[T] was born with "Duchenne's muscular dystrophy[.]" It would be incorrect to describe such a harm as a "physical" injury. A physical injury makes a person physically worse off than he or she would have been otherwise. *See Restatement (Third)* § 4 comment c ("[A]ny detrimental change in the physical condition of a person's body or property counts as a harmful impairment[.]"). A defendant therefore causes a plaintiff to suffer a physical injury when the defendant causes the plaintiff to be physically worse off than he or she otherwise would have been. But, as alleged here, T would have

had no physical state of being but for defendants' conduct, because the parents would have either not conceived T or would have terminated the pregnancy. Absent the possibility of some kind of *in utero* genetic therapy, which is not alleged, the only way that the parents could have conceived and born a child without DMD was if the parents had conceived and born a child who was not T. As a result, based on the facts that T alleges, defendants could not have caused T a physical harm.

Describing T's argument as asserting economic and emotional injuries presents a different dilemma. On the one hand, we could analyze those alleged harms the same way that we analyzed the contention that T suffered a physical injury. Under that analysis, it would be incorrect to say that defendants' conduct made T's economic and emotional well-being worse off because, but for defendants' negligence, T would have had *no* economic or emotional well-being to begin with. In that sense, T's claim would fail because he could not allege and prove that he suffered any economic or emotional harm as a result of defendants' conduct.

On the other hand, we could analyze T's economic and emotional burdens as injuries that, but for defendants' alleged negligence, T would not have suffered.[13] Under that analysis, the comparison needed to establish that defendants caused T harm would not depend on a comparison between T's life with a disability and T's life without a disability, as in the example of the prenatal injury. Instead, the harm would be established by comparing the economic and emotional burdens that T will experience in his life with DMD to the complete lack of economic and emotional burdens experienced by a person who is never born in the first place.[14]

_____

[13] In every other circumstance, there is no distinction between a standard for determining the existence of harm based on whether the plaintiff is economically or emotionally worse off and a standard based on whether the plaintiff incurs economic costs and emotional distresses that he or she would have otherwise avoided. Generally, if a defendant negligently causes a plaintiff to incur economic costs and emotional distresses that otherwise would have been avoided, then the defendant has also negligently caused the plaintiff to be economically and emotionally worse off than the plaintiff otherwise would have been.

[14] That is consistent with the position taken by the dissent. *See* 362 Or at 475 (Walters, J., dissenting).

Using that comparison to establish harm creates a problem for T. Framing T's argument in that way does not *avoid* a comparison between life and nonexistence, as T contends. Instead, it *enables* a comparison between life and nonexistence by asserting at least a partial conception of what nonexistence is like—namely, a state of being in which one experiences no economic or emotional burdens.

Nevertheless, we need not decide whether T can establish cognizable harm by comparing the economic and emotional burdens that he will experience in his life to the complete lack of economic and emotional burdens experienced by a person who is never born. Even if that comparison were sufficient to establish economic and emotional harms, T would then have to establish that his economic and emotional harms constitute the impairment of a legally protected interest that defendants were obligated to protect.

"Not all negligently inflicted harms give rise to a negligence claim. Rather, a plaintiff must suffer harm 'to an interest of a kind that the law protects against negligent invasion.'" *Lowe v. Philip Morris USA, Inc.*, 344 Or 403, 410, 183 P3d 181 (2008) (quoting *Solberg*, 306 Or at 490). As explained earlier, without a cognizable justification for legal protection, negligence law generally does not require a person to affirmatively protect others from physical and nonphysical harm and generally does not require a person to avoid causing injury to the economic and emotional interests of others. Instead, recognizing a third-party professional negligence claim for T requires that we identify T's interest in avoiding defendants' negligence and then determine whether that interest is subject to legal protection, which is the same threshold issue that we considered with respect to the parents' third-party professional negligence claim.[15]

Although we have concluded, under the facts alleged, that defendants could be required to affirmatively protect the parents' economic and emotional interests, it does not necessarily follow that defendants were required to affirmatively protect T's interests. We have recognized the

---

[15] That analysis is required even if T's injuries were physical because, like the parents, T's alleged injuries resulted from risks of harms that defendants did not create. *See* 362 Or at 442-43.

parents' claim because of their relationship to defendants and the identifiable interest that the parents had in making informed reproductive choices. T, however, did not have the same relationship to defendants and his interests are distinct from the parents' interests.

In attempting to identify T's interest in avoiding defendants' negligence, the parties offer competing definitions of the interest at stake. T defines his interest narrowly as a right to avoid the economic and emotional burdens of living with DMD, and he resists defendants' efforts to define his interest more broadly as a right not to be born or a right to remain in a state of nonexistence.

We agree with defendants that, based on T's allegations, the only way for T to avoid the economic and emotional burdens of living with DMD was to avoid being born in the first place. In other words, the specific manner in which T proposes that he should have avoided the economic and emotional burdens of living with DMD is by not being born. For T, avoiding life and avoiding the economic and emotional burdens of living with DMD are factually inseparable. Thus, protecting any interest that T could have in avoiding the economic and emotional burdens of living with DMD would result in T not being born at all. If T had no interest in avoiding life, then he had no interest in avoiding the economic and emotional burdens of living with DMD. Because, for T, avoiding life with DMD and avoiding life at all are coextensive, it is more accurate to define T's interest as an interest in avoiding life. That is, of course, the same as saying that defendants infringed T's interest in remaining in a state of nonexistence.[16]

---

[16] According to the dissent, T's interest should be defined as avoiding the harm of being born with DMD and "recovering the economic and noneconomic damages that flow from that harm." 362 Or at 477 (Walters, J., dissenting). The dissent justifies that formulation by asserting that "this court describes the plaintiff's interest as an interest in avoiding the harm caused by the wrongful act for which the plaintiff seeks recovery." 362 Or at 476 (Walters, J., dissenting). We do not share that view. As explained earlier, without a further justification for legal protection, negligence law generally does not require a person to avoid causing injury to the economic and emotional interests of others. As pleaded in this case, T's entitlement to those remedies depends on the premise that defendants infringed on T's putative protected interest in remaining in a state of nonexistence.

In assessing whether T can state a third-party professional negligence claim based on an interest in avoiding life, we consider, among other factors, whether, and to what extent, recognizing such a claim would interfere with or impair the obligations that the defendants owe to others. *See* 362 Or at 446. There can be no doubt that recognizing that a child in T's position has an interest in not being born is distinct from, and potentially at odds with, the parents' interests recognized above. *See Hester v. Dwivedi*, 89 Ohio St 3d 575, 583, 733 NE2d 1161, 1167 (2000) ("[T]he injury allegedly suffered by [the mother] (deprivation of opportunity to make an informed choice to terminate a pregnancy) is conceptually different from the injury that [the child] asserts (her birth with defects)."). The parents' claim is premised on an interest in receiving information from defendants that implicated the parents' ability to make informed reproductive choices.[17] Once the parents are informed, they are entitled to make their own reproductive choices. *See, e.g.*, *id.*, 733 NE2d at 1167 ("[N]o person has control over the occurrence or nonoccurrence of his or her own birth."); *Walker by Pizano v. Mart*, 164 Ariz 37, 42, 790 P2d 735, 740 (1990) ("Children, however, have neither the ability nor the right to determine questions of conception, termination of gestation, or carrying to term."); *James G. v. Caserta*, 175 W Va 406, 415, 332 SE2d 872, 881 (1985) ("This duty to inform does not extend to the unborn child as it is the parents' decision to risk conception or to terminate a pregnancy."). That includes choosing to conceive and bear a child even after being informed that the risks of a genetic disorder are high, or choosing not to conceive a child even after being informed that the risks of a genetic disorder are low. We would not expect a physician in either of those situations to act on behalf the child and interfere with the parents' right to make informed reproductive choices.

---

[17] Similarly, the dissent takes issue with that conception of the parents' putative interest. Instead, the dissent defines the parents' interest as avoiding the economic and emotional burdens of raising a child with DMD. According to the dissent, "Although T's parents allege, as a fact, that defendants' negligence caused the loss of their reproductive choice, they do not seek a remedy for that loss in and of itself. Rather, they seek the same thing that T seeks—a remedy for the consequences of that loss." 362 Or at 479 (Walters, J., dissenting). In our view, that conception confuses the interest to be protected with the damages necessary to compensate the infringement of that interest.

Thus, recognizing a child's independent legal interest in being conceived and born (or not being conceived and born) would create potential tension with the parents' legal interest in deciding whether or not to conceive and bear that child. The parents have alleged, and at the pleading stage we accept as true, that, if they had been informed of the risk of conceiving and bearing another child with DMD, they would not have done so. If they prove their claim, the parents will be able to seek damages for their own economic and emotional injuries associated with raising a child with DMD. A finder of fact will determine the existence and extent of those injuries from the parents' own perspective—that is, what the parents' economic and emotional well-being is having conceived and born T as compared with what the parents' economic and emotional well-being would have been if the parents had not conceived and born T.

Whether the parents' interests have been infringed does not depend on whether T's interests have been infringed. As we recognized in *Zehr*, a finder of fact may determine that parents' interests have been impaired and are entitled to damages for economic and emotional harms resulting from conceiving and bearing a child even if that child is healthy. *Zehr*, 318 Or at 657. Likewise in this case, the parents may be able to establish that their interests have been impaired and they are entitled to damages for economic and emotional harms resulting from conceiving and bearing T even if T is better off for having been born.[18]

---

[18] The tension between parental and child interests was recognized by a Connecticut court in rejecting the type of claim that T asserts here:

"Recognizing a claim for wrongful life can also be problematic because any theoretical fetal rights either to come to term or not are subject to the mother's legal rights pertaining to control of her pregnancy. *See Roe v. Wade*, [410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973)]. If a pregnant mother chooses not to have an ultrasound or amniocentesis, should her child be able to have a cause of action against the mother? If the mother chooses not to terminate her pregnancy after discovering her fetus has Dandy-Walker syndrome, Down's syndrome or any other fetal abnormality, should the child be able to have a cause of action against the mother? *** In short, should a child be able to make a claim against his or her mother if the child is born with an impairment that was detectable during pregnancy? *** Just as the child rightfully does not have a claim against the mother for bringing her pregnancy to term, the child should not have a claim against the physicians and other health care providers when instead, they are the alleged proximate cause of the pregnancy not being terminated."

The allegations in T's claim reveal—but do not purport to contend with, let alone resolve—the differences in perspective between the interests of the parents and the interests of T in relation to the decisions to conceive and bear him. Plaintiffs' failure to acknowledge and provide a coherent way to harmonize those differences counsels against recognition of a claim that ultimately depends on the parents' informed decision as being sufficient to protect the interests of T in the circumstances alleged here.

Beyond those differences in perspective between the parents' interests and the interests of T under the facts alleged in T's claim, a fundamental conceptual difficulty lies in determining whether a preconceived child has an interest in remaining in a state of nonexistence. That is a different endeavor from determining what interests a child would have *after* he or she is conceived and born. For example, once conceived and born, a child has an interest in avoiding physical injury, even if the injury is caused by conduct that occurred before the child was conceived and born. T's claim, however, depends on the premise that a preconceived child has an interest in avoiding conception and birth in the first place.

Determining whether a preconceived child has an interest in not being born, and the extent to which that interest is potentially inconsistent with the parents' interest in reproductive choice, directly raises the issue of nonexistence. Would a preconceived child want to be born even if doing so entailed the risk of a genetic disorder? Would it depend on the degree of risk? Is it possible that a preconceived child

---

*Rich v. Foye*, 51 Conn Supp 11, 42-43, 976 A2d 819 (Super Ct 2007).

We need not decide here whether a disabled child could sue her parents for wrongful life for (1) unreasonably failing to obtain genetic testing; or (2) unreasonably conceiving and giving birth to the child after being confronted with the risk of having a child born with a genetic disability. *See Winn v. Gilroy*, 296 Or 718, 734, 681 P 2d 776 (1984) (adopting *Restatement (Second)* § 895G approach and abolishing parental immunity except in instances where the act is not tortious or is privileged). However, the determination whether (as the Connecticut court assumed) a parental privilege exists in such circumstances necessarily implicates the question whether the parents' right to exercise reproductive choice effectively overrides any interest of the child in being born free of disability. Merely to state the question highlights the inherent tension between the interests of a preconceived child at risk for disability and parents who exercise reproductive choice.

would want to be born even if a genetic disorder were a certainty? Or would a preconceived child prefer not to be born even if there were no chance of a genetic disorder? Answering those questions requires the comparison that T's argument attempts to avoid—the comparison between life and nonexistence.

It is insufficient to answer that a wrongful life claim does not necessarily make any statement about the value that a preconceived child places on life itself, but simply asserts that such a child would prefer never having lived at all to living in her afflicted state.[19] That answer only underscores the problem: T's theory of relief starts from the premise that, if defendants had not been negligent, he would not have been born. Thus, as T's claim is pleaded, and regardless of how the injury is defined, we cannot avoid the question of how a preconceived child would value a life—whether impaired or not—compared to remaining in a state of nonexistence.

The question of how a preconceived child would value life as compared to nonexistence is not a question of how T, himself, subjectively answered that question before his conception and birth. So framed, that question presupposes an obvious factual impossibility. Instead, as other courts have explained, the relevant question is "of what value to [T] would his non-existence have been?" *Lininger*, 764 P2d at 1210. However, as those courts further have explained, even that question "is entirely too metaphysical to be understood within the confines of law, if indeed, the question has any meaning at all." *Id.*; *see also Gleitman v. Cosgrove*, 49 NJ 22, 28, 227 A2d 689, 692 (1967) *abrogated by Berman v. Allan*, 80 NJ 421, 404 A2d 8 (1979) ("The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination.").

T offers no suggestion for how to answer that question and cites no judicial decision that has endeavored to answer it. *See Kassama v. Magat*, 368 Md 113, 148, 792 A2d

---

[19] *See* Mark Strasser, *Wrongful Life, Wrongful Birth, Wrongful Death, and the Right to Refuse Treatment: Can Reasonable Jurisdictions Recognize All but One?*, 64 Mo L Rev 29, 63-64 (1999).

1102, 1123 (2002) (noting that every court that has considered a wrongful life claim has "agreed that it is beyond at least the practical ability, if not the underlying competence, of the law" to compare life to nonexistence). Even the three courts that have recognized limited claims of plaintiffs alleging that they should not have been born have deemed the question of how a preconceived person would value nonexistence unanswerable. *See Procanik by Procanik v. Cillo*, 97 NJ 339, 353, 478 A2d 755, 763 (1984) ("The philosophical problem of finding that such a defective life is worth less than no life at all has perplexed [previous courts] \*\*\*. We need not become preoccupied, however, with these metaphysical considerations."); *Harbeson v. Parke-Davis, Inc.*, 98 Wash 2d 460, 482, 656 P2d 483, 496 (1983) ("[M]easuring the value of an impaired life as compared to nonexistence is a task that is beyond mortals, whether judges or jurors."); *Turpin v. Sortini*, 31 Cal 3d 220, 236, 643 P2d 954, 964 (1982) ("[W]hat the plaintiff has 'lost' is not life without pain and suffering but rather the unknowable status of never having been born.").

Those three decisions, which allowed recovery only for medical expenses,[20] have been criticized for ignoring the task of identifying a cognizable injury. *See, e.g.*, *Lininger*, 764 P2d at 1212 ("We can only conclude that the Washington Supreme Court, as did the Supreme Courts of California and New Jersey, chose to disregard the child's failure to prove an injury in light of its perception that the equities of permitting the child to recover special damages were entitled to greater weight."); *Siemieniec v. Lutheran Gen. Hosp.*, 117 Ill 2d 230, 248, 512 NE2d 691, 701 (1987) *overruled on other grounds by Clark*, 353 Ill Dec 254, 955 NE2d 1065 ("Although the California, Washington, and New Jersey decisions allowed limited recovery while failing to establish the logical basis for the wrongful life action—the existence of harm or injury

---

[20] None of the three courts that have recognized wrongful life claims have allowed the recovery of noneconomic damages. In *Turpin*, for example, the California court denied recovery of such damages "because (1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner." *Turpin*, 31 Cal 3d at 235, 643 P2d at 963.

to the impaired child—this court is unwilling to discard the requirement of a legally cognizable injury in a negligence medical malpractice case.").

We agree with that critique. Identifying an injury to a legally protected interest is not a merely technical issue. It is central to establishing negligence liability. Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, 4 *Harper, James and Gray on Torts* § 20.1, at 93 (3d ed 2007) ("Negligence has traditionally been considered not to be a ground of liability unless it causes injury or damage to some interest that the law recognizes and protects."). The few courts that have permitted awards of economic damages for wrongful life have attempted to apportion the child's injury based on the idea that the defendant caused the economic loss flowing from the child's disability, but not the child's entire existence. But, that approach fails to acknowledge that the premise of such a claim—including the claim pleaded here—is that defendants' negligence caused T's very existence in an impaired state. By artificially apportioning the legal consequences of what is really an indivisible injury, the courts that have recognized claims like T's have "adopt[ed] a mix-and-match approach to apportionment" of liability. W. Ryan Schuster, *Rights Gone Wrong: A Case Against Wrongful Life*, 57 Wm & Mary L Rev 2329, 2340 (2016). Such an approach fails to confront the necessary task of identifying a legally protected interest that was violated by the defendant's negligent conduct. In short, T's claim does not fit coherently into the framework of common-law negligence because it "fail[s] to adequately describe the legally compensable injury without defining the injury as the plaintiff's very existence." *Id.* at 2337.[21]

In response, T argues that such criticisms take an overly technical view of negligence law and have resulted in decisions that have required an innocent party to endure burdens caused by a defendant's negligent conduct. The

---

[21] As Schuster further notes:

"Classifying the injury as indivisible might fit more neatly within existing tort doctrine, but would force courts to consider the plaintiff's entire life, both defect and existence, as the harm—the result they have attempted to avoid."

*Id.* at 2338.

objectives of negligence law, according to T, are best served when a negligent party incurs the costs of his or her negligent conduct. T contends that our conception of a compensable "injury" should be sufficiently malleable to meet those objectives.

At first blush, T's argument arguably finds some support in this court's recent decision in *Smith v. Providence Health & Services*. There, we recognized, as a matter of first impression, a medical negligence claim based on a loss-of-chance theory of injury. 361 Or at 482. Although, as alleged, the plaintiff in that case could not establish that the defendant's negligence caused his failure to recover from a stroke, the plaintiff alleged facts showing that the defendant's negligence caused him to lose a 33 percent chance of recovering from his stroke. This court allowed the plaintiff to proceed with his claim by defining the injury as the lost chance to recover, rather than defining the injury as the failure to recover. *Id.* at 479; *see also id.* at 467-71 (comparing causation-based theories and injury-based theories for loss-of-chance claims).

However, on closer analysis, the comparison with a loss-of-chance injury only highlights the difficulty with T's claim. A loss-of-chance injury is grounded on the mutual expectation of service and reliance that defines the physician-patient relationship. If a patient has a 33 percent chance of recovering at the time of seeking treatment from a physician, then the patient fully expects, and relies upon, the physician to preserve that 33 percent chance. A physician who fails to take reasonable care to preserve that chance clearly has acted adversely to the patient's interests. In short, under the loss-of-chance theory, "it is the alleged medical malpractice itself that makes it impossible for the plaintiff to prove that he or she would have achieved that better outcome." *Id.* at 473.

In contrast, T's claim requires us to identify the interests that we should attribute to a preconceived child—specifically, whether a preconceived child has an interest in remaining in a state of nonexistence—and determine how those interests relate to the interests of parents to whom a physician owes a duty of professional care. Although the

same or similar analysis would apply in other cases where a plaintiff alleges that, but for the defendant's negligence, the plaintiff would not have been born, the specific facts alleged in this case underscore the difficulty in determining the interests of a preconceived child.

As noted, as alleged, the parents had about a 25 percent chance of having a child with DMD and about a 75 percent chance of having a child without DMD. T's claim rests on the premise that, if the parents had been informed of those risks, they would not have conceived and born another child. Therefore, if defendants had informed the parents of those risks, defendants would have deprived the parents' preconceived child of both a 25 percent chance of a life with DMD and a 75 percent chance of a life without DMD. Is it in the interest of the preconceived child for defendants to inform the parents of those risks? It is difficult enough to determine whether a preconceived child has an interest in nonexistence when the alternative is a life with DMD. According to T, a life with DMD is shorter and involves more physical pain and medical expenses than a life without DMD. But it is not at all clear that those alleged facts make nonexistence preferable to a life with DMD. Further, how would a preconceived child value the 75 percent chance of being born without DMD as compared to nonexistence? How would the value of that 75 percent chance compare to the 25 percent chance of being born with DMD? And how significant are those differences to a preconceived child, given that, even a child without DMD can expect to incur substantial medical costs and emotional distress over the course of his or her life? The interests of a preconceived child in these circumstances are sufficiently imponderable that recognizing T's claim would require a departure from the traditional negligence principles that justified this court's recognition of the loss-of-chance theory of injury.

None of the courts that have recognized a limited right to recover economic damages in such claims has effectively confronted the difficulties that we have discussed. Instead, they primarily have resorted to practical or sympathetic considerations. For example, among the reasons that a few courts have given for recognizing a limited right to recover economic damages in similar claims is the concern

for uncompensated medical and other expenses that a disabled child might incur as an adult. *See, e.g.*, *Turpin*, 31 Cal 3d at 238, 643 P2d at 965. In that regard, we note that, for whatever reason, the parents here have not sought in their own claim to recover damages for T's economic expenses in adulthood. However, ORS 109.010 provides:

> "Parents are bound to maintain their children who are poor and unable to work to maintain themselves; and children are bound to maintain their parents in like circumstances."

This court has held that the duty of support imposed by ORS 109.010 encompasses adult as well as minor children. *Haxton and Haxton*, 299 Or 616, 705 P2d 721 (1985). In *Haxton*, this court held that the statutory duty of parental support under ORS 109.010 could be enforced in a direct action by a mentally disabled adult child against his parent. *Id*. at 631.[22]

We note that, in comparable circumstances, the New Hampshire Supreme Court relied on a parental support obligation toward adult children in concluding that a disabled child's parents could "recover extraordinary costs incurred both before and after their child attains majority" in a medical negligence action for wrongful birth. *Smith v. Cote*, 128 NH 231, 245, 513 A2d 341, 350 (1986). The court noted that "some courts do not permit recovery of post-majority expenses, on the theory that the parents' obligation of support terminates when the child reaches twenty-one," but it further noted that, in New Hampshire, "parents are required to support their disabled adult offspring." *Id*., 513 A2d at 350 As a consequence, in rejecting the child's separate claim for economic damages, the court stated:

> "[W]e are mindful that controversy regarding the *Turpin* rule may have little practical significance when recovery for wrongful *birth* is permitted. The same extraordinary expenses *Turpin* would allow in wrongful life actions are covered by our rule allowing parental recovery of post-majority expenses. Because such expenses cannot be recovered by both parent and child, the net effect is the same. Recognition of the wrongful life action would make

---

[22] The court in *Haxton* also discussed the Relative Responsibility Law, *former* ORS 416.010 to ORS 416.280 (1985). *Id*. at 626. That law has since been repealed. Or Laws 2001, ch 900, § 261. However, the foundation of the court's holding in *Haxton* was ORS 109.010, which remains unchanged to this day.

a substantial difference only in limited circumstances, as when the statute of limitations bars the parental but not the filial claim (as in *Procanik*) or when the parents are unavailable to sue."

*Id.* at 251, 513 A2d at 354.

In sum, although we do not reach the issue whether the parents could recover economic damages from defendants for costs of T's support in adulthood, it is because of the parents' own pleading decision in this case, not because of an established substantive limitation on their ability to recover post-majority economic damages in their own claim.

However, the doctrinal implications of recognizing T's right to recover such damages would be significant. To summarize: Without a principled way to determine the relative values of life and nonexistence under the circumstances alleged in this case, we cannot conclude that T had a legally protected interest in remaining in a state of nonexistence. *See, e.g.*, *Lininger*, 764 P2d at 1212 ("Our inability to find an injury to [child] does not, of course, rely on any claim that recognizing such an injury constitutes a 'disavowal of the sanctity of human life,' but only on the fundamental conceptual impossibility of determining what that injury is."). Nor can we conclude that defendants caused T to suffer an injury to a legally protected interest. Moreover, we conclude that the line that the very few courts (and none since the mid-1980's) that have permitted limited recovery have drawn between the recoverability of economic damages and noneconomic damages in grappling with those problems—although commendably sympathetic—lacks a sound foundation in doctrinal principle. In short, were we to disregard the causation and injury requirements for T's negligence claim, it would be "difficult to envision any principled basis for refusing to extend the reasoning to other elements and other situations." *Smith*, 128 NH at 252, 513 A2d at 354 (quoting *Nelson v. Krusen,* 678 SW2d 918, 931 (Tex 1984) (Robertson, J., concurring)).

It bears emphasis that we perceive no conceptual inconsistency between our recognition of parents' claim and our unwillingness to recognize T's pleaded claim. As we and other courts have observed, the objection that a medical

negligence claim by the parents involving the birth of a disabled child depends on the valuation of human life is not well taken. Under the parents' theory of relief, the relevant injury is not the resulting life, but the negligent deprivation of information that was important to the parents' protected interest in making informed reproductive choices. *Plowman*, 896 NW2d at 403. Although one aspect of the parents' damages may consist of costs associated with the care and education of a child with disabilities, those damages are recoverable only if they were caused by defendant's violation of that protected interest. *Id*. T's theory is fundamentally different: As pleaded, and despite an effort to apportion his alleged damages to avoid the problem, T's claim necessarily depends on the premise that T had a legally protected interest in not being born, rather than risk being born with DMD. As such, it is subject to the objections that we have described.

Finally, we recognize that, whenever a court denies recovery at common law to a sympathetic plaintiff, especially where expanding scientific knowledge or social principles are at play, it exposes itself to criticism for being on the wrong side of history. And, it is true that the common law typically has found ways over time to provide appropriate redress for civil wrongs by applying settled or advancing principles to novel circumstances. But, whatever the merits of other possible theories to recover the damages that T seeks may be, there is too much gap in settled principles of negligence law to bridge for us to recognize the claim that he has pleaded here. We therefore hold that T has failed to allege facts sufficient to state a cognizable claim for negligence.

The decision of the Court of Appeals is affirmed and the judgment of the circuit court is affirmed in part and reversed in part.

**WALTERS, J.,** dissenting in part and concurring in part.

T's brother, M, has Duchenne muscular dystrophy (DMD). T's parents allege that defendants were negligent in failing to diagnose M's medical disorder and that, as a result, they conceived and gave birth to T, who also has DMD. We permit T's parents to seek recovery for the economic and

emotional damages that flow from T's DMD, but we leave T, the child with the disorder, without a remedy. I respectfully dissent.[1]

The majority refuses to recognize T's claim because it concludes that, no matter how that claim is framed, "we cannot avoid the question of how a preconceived child would value a life—whether impaired or not—compared to remaining in a state of nonexistence," and that that question is "entirely too metaphysical to be understood within the confines of law, if indeed the question has any meaning at all."[2] 362 Or at 465 (internal quotation omitted). Those imponderables, the majority insists, present two obstacles to recognition of T's claim: They may preclude T from proving that defendant's negligence caused him harm, and they certainly preclude him from establishing that he has "an interest of a kind that the law protects against negligent invasion." *Id.* at 460 (internal quotation omitted). I disagree. It is not necessary to compare the value of life and nonexistence to establish that T suffered harm of the type that the law protects.

To prove harm, T need not establish, as the majority asserts, that he is "worse off" having been born with DMD than he would have been had he not been born at all. 362 Or at 458. As this court explained in *Smith v. Providence*

---

[1] I agree that T's parents claim is cognizable and concur with the majority's decision in that respect.

[2] Nonexistence is a question that poets have pondered. For instance, Joseph Brodsky ends his poem "Axiom":

"And heeding the shrill 'Amscray! Beat it! Vanish! Grab
your junk and get lost!' space itself, alias the backdrop
of life, rendered blind by a surfeit of plots,
heads toward pure time, where no one applauds.
Don't be afraid, though: I've been there. There in its bowels looms
a huge, wrinkle-spinning wheel, its roots
plugged into a raw material whose supply
we, the deposits, eagerly multiply."

Joseph Brodsky, *So Forth* 32 (1996). And in one of his "Octets," Osip Mandelstam seems to suggest that maybe there is not such a state as non-being:

"As the whisper perhaps evolved before lips,
And leaves spun and circled long before there were trees,
So those, it may be, whom our experience endows,
Before such experience have acquired their traits."

*Osip Mandelstam: Fifty Poems* 84 (1934) (Bernard Meares, trans, 1977).

*Health & Services*, 361 Or 456, 393 P3d 1106 (2017), to prove harm, a plaintiff must prove only "resulting harm to the plaintiff measurable in damages." *Id.* at 460 (quoting *Zehr v. Haugen*, 318 Or 647, 653-54, 871 P2d 1006 (1994)). Medical expenses and emotional distress fit that description. Oregon law does not require that a plaintiff prove, in addition, that she is generally "worse off" than she would have been absent those expenses and that distress.

When a defendant causes a plaintiff to incur economic costs and emotional distress, the plaintiff can seek damages for that harm regardless of the fact that, as a result of a defendant's negligence, the plaintiff's circumstances are improved. *Restatement (Second) of Torts* § 920 (1979). Thus, as explained in the *Restatement*, if A tortiously imprisons B for two weeks, B is entitled to bring a claim for false imprisonment against A, even if at the end of the imprisonment B obtains large sums for writing an account of the imprisonment. *Restatement (Second)* § 920 illustration 6. However, when a defendant's tortious conduct has caused harm to the plaintiff, and, in doing so, also has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in the mitigation of damages. *Restatement* § 920; *see also* 362 Or at 453 (so stating). So, for example, "if a surgeon performs an unprivileged operation resulting in pain and suffering, it may be shown that the operation averted future suffering." *Restatement (Second)* § 920 comment a.

In assessing T's parents' claim, the majority recognizes and applies that *Restatement* rule. 362 Or at 453-54. That has two important consequences for an assessment of T's claim. The first is that the benefits conferred by defendants' negligence—T's life and its accompanying joys—cannot be a basis for denying T's claims; they can only be a basis for mitigating his damages. The *Restatement* rule is a rule that requires mitigation of damages; it is not a rule used to determine the legal viability of a claim.

The second consequence that follows from application of section 920 is that T's damages can be calculated without comparing the relative values of life and nonexistence. As to T's economic damages, section 920 allows an offset only

when a defendant's negligence confers special benefits "to the interest of the plaintiff that was harmed." *Restatement (Second)* § 920; *see also* 362 Or at 453 (so stating). Thus, as explained in the *Restatement*, and again as the majority recognizes in analyzing T's parents' claim, "damages resulting from an invasion of one interest are not diminished by showing that another interest has been benefitted." *Restatement (Second)* § 920 comment b; *see also* 362 Or at 453-54 (so stating). For example, "damages for pain and suffering are not diminished by showing the earning capacity of the plaintiff has been increased by the defendant's act." *Restatement (Second)* § 920 comment b. Conversely, and as relevant here, section 920 does not permit a jury to offset the economic damages that it awards T by the emotional benefits that accompany his life. To calculate T's economic damages, a jury need only calculate T's medical expenses; it need not determine the value of T's life, the value of nonexistence, or whether T would prefer one to the other.

The same is true for T's emotional distress damages. Section 920 permits a jury to offset the emotional benefits that T actually experiences against the emotional harm that he actually suffers. A jury would not be required to compare the relative benefits of life and nonexistence to make that calculation.

Furthermore, even if T's harm were to depend, in some way, on a comparison between nonexistence and life, T's claim would not fail because he could not prove, as a factual matter, the precise nature of nonexistence. A jury could conclude that, if T had not been born, he would not have had DMD or experienced its associated economic and noneconomic burdens. And even if that were beyond a jury's ken, a court could take notice that if T had not been born, he would not have had legal obligations to pay medical bills or emotional distress compensable in damages. When T was born with DMD and its attendant burdens, the legal nature of his experience changed and he suffered cognizable harm.

Understandably, then, the majority is loath to decide, and does not decide, that T cannot establish that he was harmed by defendants' negligence. Instead, the majority

concludes that T's interest in avoiding that harm is not legally cognizable.

The first step in deciding whether a plaintiff's interest is legally protected against invasion is to correctly describe the interest at issue. This court describes the plaintiff's interest as an interest in avoiding the harm caused by the wrongful act for which the plaintiff seeks recovery. For instance, in *Philibert v. Kluser*, the court described the "simplest legally protected interest" as an interest in being "free from physical harm at the hands of another." 360 Or 698, 703, 385 P3d 1038 (2016) (internal quotation omitted). And, in *Philibert*, the court granted legal protection to the plaintiffs' interest in avoiding certain emotional harm—the emotional distress that occurs in observing the physical injury of a close family member. *Id.* at 708. Similarly, in *Smith*, the court granted legal protection to the plaintiff's interest in avoiding a loss of a chance of a better medical outcome when that loss of chance resulted in physical harm. 361 Or at 477, 484-85; *see also McEvoy v. Helikson*, 277 Or 781, 788, 562 P2d 540 (1977) (interest in avoiding the emotional distress that arises when a professional defendant violates a legal duty designed to protect a non client third party against foreseeable harm); *Hovis v. City of Burns*, 243 Or 607, 613, 415 P2d 29 (1966) (interest in avoiding emotional distress that arises when a defendant negligently handles a spouse's remains); *Hinish v. Meier & Frank Co.*, 166 Or 482, 503-04, 113 P2d 438 (1941) (interest in avoiding emotional distress that arises when a defendant invades a plaintiff's privacy by making a false statement of support for particular legislation). In each of those circumstances, the court considered whether to grant legal protection to the plaintiff's interest in avoiding the harm that the defendant allegedly had caused.

In each of those instances, the court then went on to determine, at the second step in the analysis, whether the plaintiff's interest in avoiding the claimed harm was of "sufficient importance as a matter of public policy to merit protection." *Philibert*, 360 Or at 705 (internal quotation omitted). So, for instance, in *Philibert*, the court considered the importance of avoiding "'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Id.* at 708 (quoting *Harris v. Suniga*, 344 Or 301,

308, 180 P3d 12 (2008)). In *Philibert*, the court was persuaded that recognizing the plaintiffs' interests in avoiding emotional distress would be consistent with that principle of tort law because the plaintiffs were family members who had witnessed the traumatic death of their brother. *Id.* at 714-16. Likewise, in *Smith*, the court considered the tort system's purpose to place the risk of negligent conduct on the responsible party and prevent future harm, the tort law principles that proof should be neither speculative nor subject to manipulation, and the public concern that the chosen rule of law not adversely affect medical practice. 361 Or at 479-80. The court was persuaded that recognizing the plaintiff's interest in avoiding a loss of chance that resulted in physical harm would accord with those principles and not have negative effects. *Id.* at 482.

   In this case, the majority starts off on the wrong foot. The majority incorrectly describes T's interest as an interest in avoiding life or remaining in a state of nonexistence. 362 Or at 464. T does not claim that before his birth he was able to form thoughts or consider whether he preferred to be born or avoid life, to exist or remain in a state of nonexistence.[3] Rather, T claims that, due to defendant's negligence, he was in fact born, and born with DMD. The majority should have followed precedent and described T's interest as an interest in avoiding that harm and recovering the economic and noneconomic damages that flow from that harm.

   The majority then veers further from the path of precedent and fails to consider the previously identified public policy considerations that weigh in favor of recognizing T's claim: Because T is a member of M's immediate family and has DMD, T is a member of a limited class and his damages are not speculative or subject to manipulation. Recognition of T's interest does not impose any greater obligation on physicians than already exists; it requires only that physicians act reasonably to diagnose the medical conditions of their

---

[3] In an early poem, "The Trial By Existence," Robert Frost imagines such a choice. Frost describes souls gathering for birth and choosing whether to step forth against the uttermost of earth. As Frost describes it, souls make that choice, but "the pure fate to which you go/Admits no memory of choice." *Robert Frost: Collected Poems, Prose, & Plays* 28 (Richard Poirier & Mark Richardson eds, 1995).

minor patients and communicate those diagnoses to their parents. And recognition of T's claim furthers one of the principles that underlies tort law—"to distribute the risks of injury to or among responsible parties." *Smith,* 361 Or at 480.

Rather than addressing those factors, the majority takes up the question of "whether, and to what extent, recognizing T's claim would interfere with or impair the obligations that [defendants] owe to others." *Id.* at 462. That question is easily answered: Recognizing T's claim would not interfere with or impair the obligations that defendants owed to their patient, M, or M's parents.

In recognizing T's parents' claim, the majority explains that defendants' obligation to exercise professional skill on behalf of M also required them to reasonably perform other tasks for those who were intended beneficiaries of their skills, including M's parents. The majority concludes that the applicable standard of care required defendants to diagnose M's genetic disorder and communicate it to his parents. 362 Or at 447.[4] And, the majority says, "satisfying the parents reasonable expectations merely required defendants to provide M with the level of care that a reasonably prudent, careful, and skillful physician would have otherwise provided to M." 362 Or at 448. Recognition of T's claim requires no more. Like his parents, T is an intended beneficiary of defendants' diagnosis and recognizing T's claim would not interfere with or impair the obligations that defendants owed to their patient, M, or his parents.

Rather than disputing that conclusion, the majority asserts that T's interest is "distinct from, and potentially at odds with, the parents' interests." 362 Or at 462. That is, of

---

[4] In reaching that conclusion, the majority draws an analogy to cases in which physicians have failed to warn of the risks posed by a patient's contagious disease. *Id.* at 448-49. Courts have permitted nonpatient family members to make claims against such physicians and have not limited those claims to nonpatients with whom the physician has a relationship. *See Hoffman v. Blackmon*, 241 So 2d 752 (Fla Dist Ct App 1970), *cert den*, 245 So 2d 257 (Fla 1971) (physician owes a duty to minor child who is a member of immediate family and living with patient to inform those charged with minor's well-being of the nature of contagious disease). Immediate family members who live with a patient are intended beneficiaries of the required warnings and are entitled to the same protection afforded to family members with whom a physician communicates.

course, an entirely different issue, but one that also is easily addressed. T's interest may be distinct from his parents' but there is no tension between them. Like T's interest, T's parents' interest is in avoiding the consequences of defendants' negligence and the burdens associated with T's medical disorder. The majority so describes T's parents' interest throughout much of its opinion. *See* 362 Or at 460 (majority determines that defendants "could be required to affirmatively protect the parents' *economic and emotional interests*") (emphasis added); *id.* at 443 (majority reasons that there must be a source of liability in addition to foreseeability to protect the parents' "*economic and emotional interests*") (emphasis added). The majority is able to identify "tension" between the two interests only by describing T's interest as an interest "in being conceived and born (or not being conceived and born)" and his parents' interest as an interest in "deciding whether or not to conceive and bear that child." 362 Or at 463. That error is fundamental. As noted, T's interest is not an interest in being conceived and born or being in a state of nonexistence. And his parents' interest is not an interest in having a reproductive choice. Although T's parents allege, as a fact, that defendants' negligence caused the loss of their reproductive choice, they do not seek a remedy for that loss in and of itself. Rather, they seek the same thing that T seeks—a remedy for the consequences of that loss.

In this case, T's parents had no reproductive choice. Therefore, there could be no tension between what they chose and what T would "want" them to choose. What happened, happened. T was conceived and born with DMD and its associated burdens. As a result, both T and his parents suffered economic and noneconomic harm and have the same legal interest in recovering damages for that harm. If there is a difference between T and his parents, it is that T alone experiences the physical consequences of defendant's negligence. T's claim is at least as important and deserving of legal protection as is his parents'.[5]

_____

[5] As the court explained in *Turpin v. Sortini*, 31 Cal 3d 220, 233-34, 643 P2d 954, 962 (1982):

"Of course, in the wrongful life context, the unborn child cannot personally make any choice as to the relative value of life or death. At that stage, however, just as in the case of an infant after birth, the law generally accords the

I understand that the majority is not alone in refusing to extend legal protection to children such as T. A number of courts have ignored the anomaly of permitting parents, but not children, to bring claims like those asserted in this case, resting their decisions on differing policy grounds. *See, e.g.*, *Phillips v. US*, 508 F Supp 537, 543 (DSC 1980) (rejecting child's claim because of the policy recognizing the "preciousness and sanctity of human life"); *Kassama v. Magat*, 368 Md 113, 149, 792 A2d 1102, 1123 (2002) (denying child's wrongful life claim and stating that "the crucial question, a value judgment about life itself, is too deeply immersed in each person's own individual philosophy or theology to be subject to a reasoned and consistent community response, in the form of a jury verdict"); *Elliot v. Brown*, 361 So 2d 546, 548 (Ala 1978) (denying child's claim and stating that "a legal right not to be born is alien to the public policy of this State to protect and preserve human life"). But some thoughtful courts have disagreed. *See Procanik by Procanik v. Cillo*, 97 NJ 339, 352, 478 A2d 755, 762 (1984) (stating that "[w]hatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the inherent injustice of that result"); *Harbeson v. Parke-Davis, Inc.*, 98 Wash 2d 460, 479, 656 P2d 483, 495 (1983) (adopting *Turpin*'s acknowledgment that it would illogical to allow parents but not the child to recover economic damages for child's disabling condition); *Trupin v. Sortini*, 31 Cal 3d 220, 238, 643 P2d 954, 965 (1982) (stating that it "would be illogical and anomalous to permit only parents, and not

---

parents the right to act to protect the child's interests. As the wrongful birth decisions recognize, when a doctor or other medical care provider negligently fails to diagnose an hereditary problem, parents are deprived of the opportunity to make an informed and meaningful decision whether to conceive and bear a handicapped child. (*See, e.g.*, *Robak v. United States, supra*, 658 F2d 471, 476; *Berman v. Allan, supra*, 404 A2d 8, 14; *Jacobs v. Theimer, supra*, 519 SW2d 846, 849; *cf. Cobbs v. Grant* (1972) 8 Cal 3d 229, 242–243, 104 Cal Rptr 505, 502 P2d 1.) Although in deciding whether or not to bear such a child parents may properly, and undoubtedly do, take into account their own interests, parents also presumptively consider the interests of their future child. Thus, when a defendant negligently fails to diagnose an hereditary ailment, he harms the potential child as well as the parents by depriving the parents of information which may be necessary to determine whether it is in the child's own interest to be born with defects or not to be born at all."

the child, to recover for the cost of the child's own medical care").[6] And some strong dissents have been penned.[7]

Like others recognizing the anomaly that a decision like the majority's permits, I too write in dissent. In doing so, I do not seek to upset settled principles of negligence law. Nor do I look away from those principles out of sympathy for T. Instead, I write to advocate for consistent adherence to those principles. I cannot identify a legal basis for denying T, the child with the disabling condition that is the gravamen of his parents' claim, the right to seek the same recovery that is permitted to his parents.

I respectfully dissent.

Kistler, J., joins in this dissenting opinion.

---

[6] In those cases, the courts did not permit the child to recover emotional distress damages, although they allowed the parents to do so. I do not see the distinction that the courts drew as valid, and neither did some of the dissenting judges in those cases. *See Procanik*, 97 NJ 339, 357, 478 A2d 755, 765 (1984) (Handler, J., dissenting in part) ("[The majority's] position reflects a reluctance, perhaps understandable, to deal with the subtle but terrible realities of the psychological, mental, and emotional damage that ensue from the birth of a congenitally defective child in these circumstances. I accept the subtlety and elusiveness of these human conditions but I do not for a moment concede that injury in this form presents insurmountable problems in fashioning relief." (Internal quotation omitted)); *Turpin*, 31 Cal 3d at 240, 643 P2d at 966 (Mosk, J., dissenting) ("An order is internally inconsistent which permits a child to recover a special damages for a so-called wrongful life action, but denies all general damages for the very same tort. While the modest compassion of the majority may be commendable, they suggest no principal of law that justifies so neatly circumscribing the nature of damages suffered as a result of a defendant's negligence."). Perhaps the results in those cases can be explained as implicitly deciding, under the mitigation rule discussed at 362 Or at 474 (Walters, J., dissenting), that the special emotional benefits of a disabled child's life offset the emotional damages that the child suffers. I would leave that question to the jury.

[7] *See, e.g.*, *Lininger v. Eisenbaum*, 764 P2d 1202, 1214 (Colo 1988) (Mullarkey, J., dissenting in part) ("Since the claims of [the child] and his parents are so closely related and, indeed, mutually dependent, I see no reason to deny one while allowing the other to stand."); *Ellis v. Sherman*, 512 Pa 14, 22, 515 A2d 1327, 1330 (1986) (Larsen, J., dissenting) ("The majority also concludes that the child's injury in this case is not a 'legal injury' because his disease was not caused by the doctors but by 'natural process.' *** 'Any argument that this life of suffering is not the natural and probable consequence of [the doctors'] misconduct is rank sophistry.'" (Quoting *Speck v. Finegold*, 497 Pa 77, 92, 439 A2d 110, 118 (1981).)); *Berman v. Allen*, 80 NJ 421, 441, 404 A2d 8, 19 (NJ 1979) (Handler, J., dissenting in part) ("The Court in this case, as in *Gleitman* before it, fails to accord a cause of action to the afflicted infant plaintiff. This denial, I most respectfully urge, is wrong.").